THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *v.*
CARL HOLDER, Defendant-Appellant.

Second District   No. 80—382

Opinion filed November 3, 1983.

William W. Reedy and Frank P. Vella, Jr., both of Rockford, and Carmell, Chrone & Widmer, of Chicago, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

The defendant, Carl Holder, was found guilty of intimidation (Ill. Rev. Stat. 1979, ch. 38, par. 12—6) after a jury trial in the circuit court of Winnebago County. He was sentenced to 18 months' probation and fined $1,000. He appealed to this court and contested, *inter alia*, the constitutionality of the section of the intimidation statute under which he was charged. This court declared section 12—6(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 12—6(a)(3)) to be unconstitutionally overbroad and reversed Holder's conviction. (*People v. Holder* (1982), 103 Ill. App. 3d 353, 431 N.E.2d 427.) Subsequently the State appealed to the supreme court.

The State's petition for leave to appeal was granted by the supreme court and the finding of this court was reversed insofar as we determined section 12—6(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 12—6(a)(3)) to be unconstitutionally overbroad. The cause was remanded to this court for consideration of the other issues raised by the parties. *People v. Holder* (1983), 96 Ill. 2d 444, 454, 451 N.E.2d 831.

The facts underlying this case have been described at length in previous opinions and only a summary will be presented here. In July of 1979 several cement truck drivers for the Rockford Redi-Mix Company, Inc. signed cards which authorized Carl Holder, the defendant, to act as their representative for purposes of collective bargaining. Holder was business representative for Teamsters Local 325. The drivers, dissatisfied with their wages and working conditions, ar-

ranged for Holder to present the authorization cards and a collective bargaining agreement to their employer, Rockford Redi-Mix.

The drivers made an agreement with Holder that they would report to work the following morning as scheduled, load their trucks with cement and proceed to a meeting spot on the way to their assigned job site. When the last truck left, the defendant, who would be parked near the plant, would enter the office and demand that the employer recognize the union and sign the union's contract. The defendant suggested that the drivers accompany him in presenting the contract, but the employees agreed to meet him after he had presented the Redi-Mix contract. The drivers hoped that Holder's unannounced appearance and presentation of the contract would provide them with sufficient leverage so that the union would be recognized and the contract signed.

At 7:45 in the morning of July 25, Holder and a union secretary entered the office of the general manager of Rockford Redi-Mix, Curt Countryman. Holder told Countryman they were from the union and represented a majority of his employees. According to Countryman, Holder told him that "the trucks that had just left are sitting down the road, and the drums aren't turning till I [Countryman] signed the contract." Countryman looked through the contract but refused to sign it. Holder testified that he then said, "Okay, sir, you've got a strike on your hands." Holder denied referring to the drums or the trucks.

The drivers and Holder then went to the job site at about 10:55 a.m. They contacted the employer by radio and left the message that they had arrived at the job site. The drivers then shut down the drums on their cement trucks. They indicated the drums had been turning up to this point. By the time an associate of Countryman's arrived at the job site the cement was hardened in some trucks, and there were no drivers present. There was a difference of opinion as to whether the cement could have hardened as quickly as the State's witnesses indicated. Countryman testified that it was necessary to replace one drum and jackhammer others to remove the hardened cement.

Holder and the drivers were charged, in an amended seven-count information, with the felonies of conspiracy, criminal damage to property and intimidation. The jury convicted Holder on one count of intimidation and acquitted him, and the drivers, on all other counts.

The defendant's initial contention on appeal was a challenge to the constitutionality of section 12—6(a)(3) of the Criminal Code of 1961. He contended it was overbroad and violative of his first amend-

ment rights. The supreme court found that "the flaw in section 12—6(a)(3) is not a 'substantial concern' when viewed in the context of the legitimate sweep of an intimidation statute." (*People v. Holder* (1983), 96 Ill. 2d 444, 454, 451 N.E.2d 831, 835.) Thus, we turn to the remaining issues raised by Holder on appeal.

■ Holder contends on appeal that section 12—6(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 12—6(a)(3)) is unconstitutional as applied to him even if it is valid on its face. Defendant relies on the case of *Watts v. United States* (1969), 394 U.S. 705, 22 L. Ed. 2d 664, 89 S. Ct. 1399, where the Supreme Court considered whether a statement made by an 18-year-old, in which he threatened to shoot the president if he was drafted and had to carry a rifle, was constitutionally protected. The court stated the statute prohibiting such threats on the president (18 U.S.C. sec. 871 (1976)) requires that the government prove there was a threat. The court did not believe the "political hyperbole" indulged in by petitioner was such a threat. Rather, it stated, the language was a crude and offensive method of stating a political opposition to the president. While it is true that *Watts* bears some similarities to the facts of the case at bar, we believe it is fundamentally inapposite. In *Watts,* unlike the case at bar, the statements made were recognized as protected speech based on the principles that debate on public issues should be wide open and robust (394 U.S. 705, 708, 22 L. Ed. 2d 664, 667, 89 S. Ct. 1399, 1401). The court also recognized that speech in labor disputes can even be "vituperative, abusive and inexact." By contrast, in the instant case Holder was not interested in any form of discussion. His statements did not advocate a theory, but rather sought to coerce the employer to sign, or face as an alternative, the consequences. In the present context the statements were designed to intimidate and coerce. This is what the intimidation statute was intended to prohibit. We do not believe the statute is unconstitutional as applied.

We turn next to Holder's claim that his speech was protected under Federal labor law. While the federally created right to strike (29 U.S.C. sec. 157 (1976)) has been construed to protect abusive, intemperate or defamatory language which may otherwise be actionable (*Old Dominion Branch No. 496 v. Austin* (1974), 418 U.S. 264, 41 L. Ed. 2d 745, 94 S. Ct. 2770), we believe the statement made by Holder, that the "drums aren't turning," was not within the umbrella of protection afforded by the Federal law.

■ Defendant concedes, for purposes of this appeal, that his conversation in the Redi-Mix office was as Countryman testified; *i.e.,* that he stated the drums were not going to turn unless the contract

was signed. The implication of this statement was that the concrete would harden in the trucks, and repairs to those trucks would have to be made by the employer unless he signed the contract. Holder's position is that it was within his authority, as union representative, to make such a statement. We disagree. While Holder had clear authority to put economic pressure on the employer, he also had a duty to bargain collectively with the goal of reaching an agreement. (*NLRB v. Insurance Agents' International Union, AFL-CIO* (1960), 361 U.S. 477, 484, 4 L. Ed. 2d 454, 461, 80 S. Ct. 419, 424.) While it is clearly not our role to ascertain if or when Holder violated his duty to bargain collectively, the cases which discuss that issue have significance in our determination of whether Holder's conduct was protected by Federal labor policy. In the above-cited *NLRB* case the employees engaged in harassing tactics which, the employer contended before the National Labor Relations Board (NLRB), amounted to a refusal to bargain collectively. The court found that the union had not breached its duty to bargain in good faith, and could use economic pressure and still be considered to have been bargaining in good faith. The case considered the scope of section 8(b)(3) of the National Labor Relations Act (NLRA) (29 U.S.C. sec. 158(b)(3) (1976)), which makes it an unfair labor practice for a labor organization to refuse to bargain collectively with an employer. In discussing what types of conduct may be protected Justice Frankfurter stated in his separate opinion:

"Moreover, conduct designed to exert and exerting 'economic pressure' may not have the shelter of sec. 8(b)(3) even in isolation. Unlawful violence, whether to person or livelihood, to secure acceptance of an offer, is as much a withdrawal of included statutory subjects from bargaining as the 'take it or leave it' attitude which the statute clearly condemns. One need not romanticize the community of interest between employers and employees, or be unmindful of the conflict between them, to recognize that utilization of what in one set of circumstances may only signify resort to the traditional weapons of labor may in another and relevant context offend the attitude toward bargaining commanded by the statute. Section 8(b)(3) is not a specific direction, but an expression of a governing viewpoint or policy to which, by the process of specific application, the Board and the courts must give concrete, not doctrinaire content." *NLRB v. Insurance Agents' International Union, AFL-CIO* (1960), 361 U.S. 477, 506, 4 L. Ed. 2d 454, 474, 80 S. Ct. 419, 436.

Thus, under judicial interpretations of the NLRA, the right to

strike is not an unqualified right. Further, we do not believe Holder's conduct in the instant case was protected by the national labor policy.

The defendant's next claim on appeal is that he was not proved guilty of intimidation beyond a reasonable doubt. He contends his statement was not a threat made without "lawful authority" under the statute. (Ill. Rev. Stat. 1979, ch. 38, par. 12—6(a)(3).) However, as previously discussed, we believe the statement concerning the drums not turning was not protected by the right to strike provisions of the NLRA. Thus, Holder exceeded his authority. Holder also urges his statement was not a threat. However, the record belies this assertion.

On appeal, Holder concedes that he entered Countryman's office and told Countryman the "drums aren't turning" unless Countryman signed the contract. Holder interprets this statement as meaning the employees were going on strike rather than that they intended to criminally damage the cement trucks. We believe the statement was an unequivocal threat by Holder, and there was ample evidence for the jury to have found that Holder intended to make Countryman sign the contract by threatening him with damaging the trucks which were parked down the road.

■■ ■ The gravamen of the offense of intimidation is the exercise of improper influence, the making of a threat with the intent to coerce another. (*People v. Hubble* (1980), 81 Ill. App. 3d 560, 563-64, 401 N.E.2d 1282, 1285.) It has also been held that implicit in the word "threat" as it is used in the intimidation statute, is the requirement " 'that the expression in its context have a reasonable tendency to create apprehension that its originator will act according to its tenor.' " (*People v. Gallo* (1973), 54 Ill. 2d 343, 352, 297 N.E.2d 569, quoting from *Landry v. Daley* (N.D. Ill. 1968), 280 F. Supp. 938, 961.) Holder contends that Countryman's response to the statement regarding the drums not turning was not one of apprehension. We believe Holder's statement did have the reasonable tendency to make one believe the truck would be damaged—in context, the statement "the drums aren't turning until ***" indicates they were stationary and would not move unless the contract was signed. There was evidence that all concerned were aware that if the drums did not turn then the cement would harden, resulting in damage to the trucks. There was ample evidence that Holder had, and would, act according to the tenor of his threat. *Gallo* need not be interpreted to mean the State has the burden of showing Countryman's subjective response to Holder's statement. In context, the threat made was clearly one which would create apprehension. Holder's statement indicated an intent to act and had a reasonable tendency to coerce. (54 Ill. 2d 343, 353, 297

N.E.2d 569.) The State met its burden of proof beyond a reasonable doubt.

Holder also contends his conviction is inconsistent with the verdicts of acquittal rendered by the jury. Because the drivers were acquitted on all charges and Holder was acquitted on charges of conspiracy and damage to property, he urges that his communication did not constitute a threat to criminally damage the trucks. Holder contends that, where the jury found there was no agreement to communicate a threat of a crime, and there was no criminal damage to property, the verdicts are inconsistent.

While it could be argued that there is some logical inconsistency to being convicted of threatening to commit a crime and acquitted of the commission, we do not believe there is a legal inconsistency in the verdicts. The jury may have believed that Holder had the intent to communicate a threat to commit a criminal act under 12—6(a)(3), but he did not succeed in carrying out the threat to damage the trucks. There was conflicting evidence concerning the extent of damage caused to the trucks. Viewed in this manner the verdicts are consistent, both legally and logically.

■ The rule in Illinois is that consistency in verdicts is not necessary. (*People v. Dawson* (1975), 60 Ill. 2d 278, 326 N.E.2d 755; *People v. Worsham* (1979), 79 Ill. App. 3d 1061, 1064, 398 N.E.2d 1068.) Further, legal inconsistency generally involves a situation where the essential elements of a crime are said to both exist and not exist at the same time. (*People v. Murray* (1975), 34 Ill. App. 3d 521, 340 N.E.2d 186.) Here, the elements of intimidation differ widely from the elements of conspiracy and criminal damage to property. It has been held that a conviction for intimidation is not legally inconsistent with the acquittal of the underlying charge. *People v. Hairston* (1970), 46 Ill. 2d 348, 361-62, 263 N.E.2d 840.

Holder also contends that he only said what the drivers told him to say, inferring he was not responsible for his own actions. Holder cites no authority for this line of reasoning and we believe it is without merit. We see no cause for reversal in this issue.

■ The next contention of error concerns the admission of certain evidence at trial. Holder contends he was prejudiced by the admission of the amount of monetary damages. While the State need not prove the exact amount of damages in a criminal damage to property case, it does have to prove the minimum amount necessary to justify a felony conviction. (*People v. Carraro* (1979), 77 Ill. 2d 75, 79-80, 394 N.E.2d 1194.) Thus, the evidence was properly allowed by the trial court.

Holder also contends that the State sought to prejudice him by referring to the "Central States, Southeast and Southwest Areas Pension Fund." The State urges that this reference was intended to show the complexity of the contract Holder had presented for Countryman's signature. We see no basis for presuming that this evidence was prejudicial, or even if it was, it should warrant reversal.

■ Holder's next claim is that the jury was improperly instructed. He objected to Illinois Pattern Jury Instruction (IPI), Criminal, No. 2.01 (1968), given by the State. The instruction to the jury was given without modification, but Holder urges it should have been modified to add the word "felony" before the word "crimes." This, he urges, was necessary to let the jury know the seriousness of the offense. However, where an IPI instruction is applicable, it should be modified only where the facts make the uniform instruction inadequate. (*People v. Pates* (1980), 80 Ill. App. 3d 1062, 1067, 400 N.E.2d 553, 556.) We see no prejudicial error in this regard.

Holder also claims he was prejudiced by the court's failure to allow certain of his instructions. However, these instructions would likely have only confused the jury inasmuch as they were argumentative, and this alone is sufficient reason to reject an instruction. Any non-IPI instruction given is required to be "simple, brief, impartial, and free from argument." (73 Ill. 2d R. 451(a).) The trial court properly refused these. We note that the jury was instructed that defendants had a right to strike and that a "strike" was defined. Holder's contention that the jury should have been further instructed about "self-help allowed as pressure in the bargaining process" was, we believe, too argumentative to be included in jury instructions.

■ ■ There is no dispute that when certain union related activity is arguably subject to section 7 or section 8 of the NLRA (29 U.S.C. secs. 157, 158 (1976)) both State and Federal courts must defer to the NLRB. (*San Diego Building Trades Council v. Garmon* (1959), 359 U.S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773.) While defendant has not specifically challenged the jurisdiction of the State courts, the Illinois Supreme Court has directed that we "make a preliminary finding as to any labor law preemption question under the National Labor Relations Act (29 U.S.C. sec. 157) that may arise in prosecuting this defendant under section 12—6(a)(3) of the Illinois intimidation statute." (*People v. Holder* (1983), 96 Ill. 2d 444, 454, 451 N.E.2d 831.) The NLRA was designed to protect the rights of employees who choose to bargain collectively. However, Federal preemption is not total, and as the court recognized in *Garmon*, compelling State interests can arise that allow the States to enjoin violence and imminent-

threats to the public order. " '[I]ntimidation and threats of violence' " were specifically recognized as compelling State interests in *Garmon*. (359 U.S. 236, 248, 3 L. Ed. 2d 775, 785, 79 S. Ct. 773, 781.) A compelling State interest has also been recognized in order to "deal with unlawful coercion which does not significantly conflict with the purposes of federal law." (*American Federation of Musicians v. Reno's Riverside Hotel, Inc.* (1970), 86 Nev. 695, 699, 475 P.2d 220, 222.) Similarly, we do not believe the NLRA preempts the State from enforcing the criminal provision in issue here. There is no public policy more important or more fundamental than that which favors the effective protection of the lives and property of citizens. (*Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 163, 2 L. Ed. 60, 69.) On a preliminary basis, we believe the intimidation charges in the instant case give rise to a compelling State interest which allow this court to consider the issues raised by the parties.

It has also been held that State jurisdiction is not preempted where the alleged misconduct of a union is only *arguably* protected under national labor law. In *Sears, Roebuck & Co. v. San Diego County District Council* (1978), 436 U.S. 180, 56 L. Ed. 2d 209, 98 S. Ct. 1745, it was held that where the assertion of State jurisdiction did not create a significant risk of prohibition of protected union conduct, there was no reason to presume that the California State courts should be deprived of jurisdiction to entertain a trespass action brought by Sears for trespassory picketing. In the instant case, the intimidation charge is separable from the Federal issues that may exist here. It is quite possible that the State or Federal courts are the only forum in which Holder's claims could be resolved. Further, Holder never presented the issue to the NLRB. See 436 U.S. 180, 202-03, 56 L. Ed. 2d 209, 228-29, 98 S. Ct. 1745, 1760.

While the NLRA is a pervasive Federal scheme of regulation, we do not believe that its operation is inconsistent with State enforcement of a State criminal law in the instant case.

For the reasons stated, we are of the opinion that the judgment of the circuit court of Winnebago County be affirmed.

Affirmed.

SEIDENFELD, P.J., and VAN DEUSEN, J., concur.