ROCKFORD REDI-MIX, INC., *et al.*, Plaintiffs-Appellees, v. TEAMSTERS LOCAL 325, GENERAL CHAUFFEURS, HELPERS AND SALES DRIVERS OF ROCKFORD, ILLINOIS, *et al.*, Defendants-Appellants.—ROCKFORD REDI-MIX, INC., *et al.*, Plaintiffs-Appellants, v. TEAMSTERS LOCAL 325, GENERAL CHAUFFEURS, HELPERS AND SALES DRIVERS OF ROCKFORD, ILLINOIS, *et al.*, Defendants-Appellees.

Second District Nos. 2—89—0044, 2—89—0045 cons.

Opinion filed February 20, 1990.—Rehearing denied April 19, 1990.

Carmell, Charone, Widmer & Mathews, Ltd., of Chicago (David J. Mathews, of counsel), for appellants.

Michael K. Havrileski, of Abramson & Fox, of Chicago, and Center on National Labor Policy, Inc., of North Springfield, Virginia (Gerard C. Smetana and Michael E. Avakian, of counsel), for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiffs, Rockford Redi-Mix, Inc., and Curt and Duane Countryman, filed a lawsuit against Teamsters Local 325, General Chauffeurs, Helpers and Sales Drivers of Rockford, Illinois, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, their agents and members, named and unnamed, individually, seeking injunctive relief and damages for destruction of plaintiffs' trucks during a strike by the union. Following trial, the trial court denied injunctive relief and dismissed the union as a defendant but awarded damages against the individual defendants and all of the members of the union. The defendants appeal. The plaintiffs also appeal from the decision of the trial court, and the two appeals have been consolidated by order of this court.

Following oral argument in this case, plaintiffs filed a motion for leave to file a post-argument limited supplemental memorandum together with the supplemental memorandum. The plaintiffs contend that, in light of a question put to plaintiffs' counsel during oral argument concerning the appropriateness of a judgment against individual union members, further explanation of plaintiffs' position on this issue is necessary. Defendants object to the motion and allege that it is violative of Supreme Court Rules 343 and 352 (107 Ill. 2d Rules 343,

352). In the alternative, defendants request leave to file their response to the plaintiffs' supplemental memorandum.

■ Nothing in either Rule 343 or Rule 352 prohibits the filing of an additional memorandum after oral argument. Rule 352 does provide that leave of court is necessary before such an additional memorandum may be filed and that is exactly what plaintiffs have sought in this case. (See 107 Ill. 2d R. 352(f).) In the interests of justice, we grant plaintiffs leave to file their supplemental memorandum, deny defendants' objection to the filing of the motion and grant defendants' request to file their response to plaintiffs' supplemental memorandum. We have given due consideration to the content of the supplemental memorandum and the response thereto in reaching our decision in this case.

The facts underlying this case have been described at length in the previous opinions issued by this court and our supreme court in *People v. Holder*, in which defendant Holder challenged his conviction for intimidation. (See *People v. Holder* (1982), 103 Ill. App. 3d 353, *rev'd & remanded* (1983), 96 Ill. 2d 444, *later opinion* (1983), 119 Ill. App. 3d 366.) Given that this opinion will focus on different issues, we will attempt to avoid unnecessary repetition.

In July 1979, several of Rockford's drivers, dissatisfied with their wages and working conditions, requested that Teamsters Local 325 (Union) act as their collective-bargaining agent. The drivers signed cards which authorized defendant Carl Holder (Holder), the union representative, to act as their representative for purposes of collective bargaining. Holder was to present the authorization cards and a collective-bargaining agreement to Rockford.

Pursuant to an agreement between Holder and the drivers, on the morning of July 25, 1979, the drivers reported for work and obtained their loads of cement and rendezvoused in their trucks away from the plaintiffs' premises, there to await word from Holder, who planned to approach Rockford and demand recognition after the drivers had gone.

That same morning at 7:30 a.m., Holder and Russell Olson, a union officer, entered the office of Rockford's general manager, Curt Countryman. Holder advised Countryman that a majority of his drivers had executed authorization cards, which he displayed to Countryman, and laid a collective-bargaining agreement on his desk. According to Countryman, he was further advised by Holder that the trucks were parked down the road and that the drivers would not return unless he signed the union contract. After reading the contract, Countryman refused to sign it. Holder then advised Countryman that a

strike was in progress.

Holder and Olson left and met with the drivers on Cherry Valley Road. Holder then went to a nearby restaurant to call John Holub, vice-president for labor relations for Rockford Blacktop, to ask him to intercede with Countryman on behalf of the union. Holub was not in when Holder called but returned his call at 9 a.m. After speaking with Holder, Holub called Duane Countryman (Curt's father and the other owner of Rockford). Holub informed him of Holder's demand that he sign the collective-bargaining agreement, which Duane refused to do. Holub contacted Holder and informed him that Duane would not sign the agreement. Holder then received a telephone call from Jim Prunty, an attorney, who stated that he represented plaintiffs. After talking with Prunty, Holder returned to the site where the trucks were parked and informed the men that the contract was not going to be signed. According to Holder, he advised the drivers to make the delivery to the jobsite in Kirkland where they were supposed to deliver that morning. When they arrived, the contractor was not there. Holder had one of the drivers try to contact Rockford to let it know the trucks were on the jobsite. After some discussion, they decided to leave the trucks with the ignitions off, drums stopped, with the keys in the ignition. Holder saw some of the drivers put water in the tanks. Holder then drove the men to his office. According to Holder, at 11:05 a.m., he tried unsuccessfully to reach Rockford and then called Holub. He left a message with Holub's secretary to call Duane to let him know that his trucks were at the jobsite, and he was concerned that the cement would harden. Holder stated that he did not know how long it took cement to harden.

In the meantime, following Holder and Olson's early morning visit, Curt attempted to locate Duane; also, he talked to their corporate attorney between 8 and 8:15 a.m. He finally reached Duane at about 8:20 a.m. by telephone and informed him of the situation. A search was launched for the missing trucks.

According to Curt, at 8:45 a.m., one of the drivers, defendant John Calhoun, called in to the office to ask if his representative had been there. Curt told him that someone had been there, to which Calhoun replied that "the drums were not turning without a contract." Calhoun then signed off the radio, preventing Curt from asking where the trucks were. At about 9:30 a.m., Curt reached Calhoun on the radio and warned him that he could be held liable if any damage was done to the vehicles.

Curt was also in contact with David Shue, Sr., of Belvidere Concrete, at 9 a.m., at 10 a.m., and a third time at about 10:40 a.m. that

morning. Shue was the contractor for the cement that Rockford was to deliver that morning to Kirkland. Shue made repeated calls to Curt to learn the whereabouts of the cement trucks because he could not afford to leave his crews idle at Kirkland waiting for the trucks. In each conversation, the condition of the cement was discussed. Finally, it was agreed that the cement would be too old to use.

At 10:53 a.m., Duane heard the transmission by one of the drivers that the trucks were at the Kirkland site. He and extra drivers arrived at the jobsite at 11:15 a.m. Duane found the muffler and the engines of the trucks to be cold. The cement had hardened in the trucks, and an attempt to rotate the drums resulted in blowing the hydraulic lines. Duane ordered the drivers to stop attempts to rotate the drums in order to minimize the damage. After waiting for the De Kalb County police to arrive to make a report, Duane and the extra drivers drove the trucks back to the plant, arriving at about 3 p.m.

The following day, Local 325 and the individual defendants began picketing Rockford. On August 1, 1979, Rockford terminated the striking employees. The strike and picketing lasted until October 9, 1979, when the National Labor Relations Board issued an order certifying that the union had lost the election to represent the workers.

Prior to the incident on July 25, 1979, Rockford owned 11 trucks and leased a twelfth. Of these, eight were operational, five on a regular basis and three older models on a standby basis, when necessary for a large pour or to replace a regular truck for maintenance. After the events of July 25, 1979, Rockford had only one truck running. Of the four out of service, one truck was back in service as of August 31, 1979, after the concrete was jackhammered out of the drum. Three trucks had to have their drums replaced. Truck 29 was back in service on October 9, 1979, truck 30 was back in service on October 25, 1979, and truck 20 was sold in September 1979, after being outfitted with a drum and mixer off another truck.

The testimony at trial revealed that the defendants-employees were aware that the longer concrete sits in the drum of the truck, and the sooner the drum stops rotating, the faster the mixture will be set. Defendant Holder was also aware that there was a time span in which the cement might harden in the drum. Rockford also had a policy of not using cement if it was not dumped on a job within two hours of batching and, if water was not added to the drum at that time, to return to the plant or to a garbage dump to dispose of the load. Since the addition of water to concrete lowers the quality, Rockford's policy manual requires that a notation must be made on the delivery ticket of the exact amount of water added.

Rockford also presented the testimony of R. Fletcher Klouthis, senior materials technologist for the Construction Technology Laboratory of Portland Cement Association, concerning the hardening process of cement. According to Klouthis, the hardening of cement is caused by the heat of hydration, which is a chemical process. Concrete does not dry and harden but hardens through a chemical process influenced by cement content (high percentage—faster the set), an ambient temperature (higher the temperature—faster the set), and mass (thicker the mass—more heat generated). In thick masses, such as basements, foundations, and dams, special precautions are taken to control the considerable amount of heat being generated, such as through the installation of cold water pipes through the mass and mixture of the concrete with ice. A filled concrete mixer drum represents a considerable mass of concrete. The addition of water, however, lowers the quality of concrete. Thus, concrete is of a higher quality if the use of water is minimized.

Klouthis further testified as to the results of a test Rockford requested that he make as to the setup time of a five-bag cement mixture under the approximate conditions, the time frames and events stated by the defendants. He tested the concrete in an actual drum and confirmed that the samples tested resulted in a very conservative initial set time in relation to the mass existing in the mixer. He also testified that, if the drum had been turned off after mixing 50 minutes and then left to sit for two to three hours, it would decrease the time to initial set (where the concrete is quite stiff and can no longer be vibrated, worked, or moved around for forming). Based upon this test, Klouthis testified that the initial set was reached, at the very latest, at 11 a.m. on July 25, 1979, four hours after the initial batch was mixed at the plant.

Plaintiffs also presented rebuttal testimony as to Rockford's loss of business due to the acts of the defendants. Curt Countryman testified that the initial loss of business after July 25, 1979, was occasioned by three factors: (1) the lack of trucks; (2) the absence of employees to drive them due to the strike; (3) and the presence of union pickets at the jobsites. Robert R. Stenstrum, president of Robert R. Stenstrum, Inc., a commercial general contractor, testified that his company had done business with Rockford prior to the events of July 25, 1979. After that date, Rockford did not have enough vehicles to afford Stenstrum's company the service necessary to keep his cost down. Stenstrum also testified that if Rockford were to go back into business, he would use it again. Another cement contractor, Robert L. Lebrey, also testified that he had used Rockford to furnish cement,

but he stopped using it when its trucks went out of service. He stated that he was not in a position to go back to Rockford when Rockford's trucks were repaired because he had committed himself to his former ready-mix suppliers, Acme Ready Mix (Acme) and Blackhawk. Greg Clayburg, also a concrete contractor, testified that he tried to do business with Rockford after the incident on July 25, 1979, but found that there were no trucks available. He was aware that Rockford was working on getting its equipment back in service, but, by that time, he was already committed to other cement suppliers. On cross-examination, Clayburg testified that he did not give Rockford his business in 1980 because of the July 25, 1979, incident with the trucks. David Shue, who operated Belvidere Concrete, Inc., in 1979, testified that it was common in the industry for a contractor to commit himself to one supplier by verbal agreement. He had a "gentlemen's agreement" with Rockford for Rockford to supply all of Belvidere's redi-mix needs. After the July 25, 1979, incident, Shue testified that he had to purchase concrete on a COD basis from his new supplier because he had been doing business with Rockford.

In 1981, Rockford went out of business.

On July 29, 1979, Rockford filed a complaint at law against the defendants. On plaintiffs' motion, the law case was dismissed, and a suit in chancery was instituted. Pursuant to their second amended complaint, plaintiffs sought injunctive relief, actual and exemplary damages for repair and replacement of the vehicles for lost profits, intentional interference with prospective economic advantage, and breach of contract.

Following the trial in this case, the trial court held that plaintiffs' claim for damages was not preempted by Federal labor law. The trial court denied plaintiffs' request for injunctive relief but awarded plaintiffs both $14,778.31 in actual damages to the plaintiffs' trucks and $35,839.99 against the individually named defendants and the present members of Local 325. The trial court declined to award prejudgment interest or punitive damages. These appeals followed.

In their appeal, the defendants have raised the following issues: whether the complaint is preempted by Federal law; whether the trial court's factual findings support the legal conclusion that an intentional tort was committed; whether a judgment for damages may be entered against the individual defendants; and whether the trial court erred in awarding lost profits as an element of damages or, alternatively, whether the trial court erred in determining the period of time for which lost profits should be awarded.

The defendants contend, first, that the trial court erred when it

failed to dismiss the complaint as preempted by Federal labor law. Defendants argue that the strike in this case was to pressure the company into recognizing the union, and, thus, this suit is preempted under the preemption test set forth in *Falls Stamping & Welding Co. v. UAW* (6th Cir. 1984), 744 F.2d 521. In that case, the employer brought an action for tortious interference with a business based upon a union's alleged unreasonable bargaining demands, threats during the negotiations, and the encouragement of a strike undertaken for the purpose of harming the company. Holding that the claims were preempted, the United States Court of Appeals for the Sixth Circuit stated:

"Federal labor law clearly permits employees to inflict economic harm on an employer for purposes of collective bargaining. Methods such as striking and picketing, protected by the Norris-LaGuardia Act and the National Labor Relations Act, are intended to cause monetary losses so that compromise or concession becomes a more desirable alternative. [Citations.] The question of whether strikes and bargaining tactics interfere unlawfully with an employer's business is to be determined by the NLRB. In this case, the alleged tort was not peripheral to a labor dispute but at the heart of it. The NLRB would focus on both the activity (strikes, picketing, threats) and the object (whether to gain advantage in bargaining or purely to harm the company). [Citations.] If a state court were to rule that the Union's conduct was tortious, it could clash head-on with decisions of the NLRB." 744 F.2d at 524-25.

We note that in *Falls Stamping*, the court also agreed that "as long as a state court can order a remedy without interfering with federal labor policy, the state court may act to protect important state interests." (744 F.2d at 523.) Preemption was found in *Falls Stamping* because the economic coercion or harm the union had undertaken was contemplated by the NLRA and "intended to cause monetary losses so that compromise or concession becomes a more desirable alternative." (744 F.2d at 524.) However, in the case at bar, damages were not awarded for striking or any other "economic coercion" contemplated by the NLRA but for the destruction of property, an activity we conclude is not protected and, therefore, not subject to being preempted by Federal labor law.

In deciding that the suit here is not preempted, the trial court relied on United States Supreme Court cases, to wit, *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters* (1978), 436 U.S. 180, 56 L. Ed. 2d 209, 98 S. Ct. 1745, *Farmer v. United Broth-*

*erhood of Carpenters & Joiners of America, Local 25* (1977), 430 U.S. 290, 51 L. Ed. 2d 338, 97 S. Ct. 1056, and *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon* (1959), 359 U.S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773.

■■ In *San Diego Building Trades Council v. Garmon*, the United States Supreme Court established the general proposition that State torts affecting matters, arguably protected by section 8 of the National Labor Relations Act, are not preempted when such activities have only a peripheral concern to the Act or involve compelling State interests. *Garmon*, 359 U.S. at 243-44, 3 L. Ed. 2d at 782, 79 S. Ct. at 778-79.

In *Sears, Roebuck & Co. v. San Diego County District of Carpenters* (436 U.S. 180, 56 L. Ed. 2d 209, 98 S. Ct. 1745), two union business officials attempted to convince the manager of a Sears store to use the union hiring hall or to agree in writing to abide by the terms of the union's master labor agreement with respect to the use of carpenters. When neither was accepted, the union set up picket lines on privately owned sidewalks and a parking lot area near the store. Sears obtained an injunction prohibiting the union from trespassing. However, the Supreme Court of California reversed, concluding that the picketing was a protected activity because it was intended to secure work for union members and publicize Sears' undercutting of prevailing area standards for employment of carpenters.

■■ The United States Supreme Court, refusing to apply *Garmon* guidelines in a literal fashion, stated that the decision to preempt the State court's jurisdiction over a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the national labor policy of permitting the State court to proceed. The question is whether there is a realistic risk of interference with the labor board's primary jurisdiction to enforce unfair labor practices.

■■ We agree with plaintiffs that the NLRB could not exercise jurisdiction over the defendants' activities because the acts against Rockford were destructive, not coercive, acts protected by section 7. Further, the State court's jurisdiction to provide relief to the plaintiffs here does not run a realistic risk of interference with the labor board's jurisdiction. As the Supreme Court found in *Sears*:

> "the tort claim entailed little risk of interference with the regulatory jurisdiction of the Labor Board. Although the arguable federal violation and the state tort arose in the same factual setting, the respective controversies presented to the state and federal forums would not have been the same. 436 U.S. at 196-

97, 56 L. Ed. 2d at 225, 98 S. Ct. at 1757.

In *Farmer v. United Brotherhood of Carpenters*, plaintiff sought recovery of damages for the tort of intentional infliction of emotional distress due to the union's hiring-hall operations. The trial court awarded damages to plaintiff but the court of appeal reversed, holding that the State courts had no jurisdiction over the complaint since the "crux" of the action concerned employment relations and involved conduct arguably subject to the jurisdiction of the NLRB. The United States Supreme Court disagreed, stating:

> "Viewed, however, in light of the discrete concerns of the federal scheme and the state tort law, that potential for interference is insufficient to counterbalance the legitimate and substantial interest of the State in protecting its citizens. If the charges in Hill's complaint were filed with the Board, the focus of any unfair labor practice proceeding would be on whether the statements or conduct on the part of union officials discriminated or threatened discrimination against him in employment referrals for reasons other than failure to pay union dues. See n. 11, *supra*. Whether the statements or conduct of the respondents also caused Hill severe emotional distress and physical injury would play no role in the Board's disposition of the case, and the Board could not award Hill damages for pain, suffering, or medical expenses. Conversely, the state court tort action can be adjudicated without resolution of the 'merits' of the underlying labor dispute." (430 U.S. at 304, 51 L. Ed. 2d at 352-53, 97 S. Ct. at 1065.)

The Supreme Court pointed out that "[n]othing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute, [citations], and thus there is no risk that state damage actions will fetter the exercise of rights protected by the NLRA." 430 U.S. at 299, 51 L. Ed. 2d at 349-50, 97 S. Ct. at 1063.

Defendants' reliance on *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n* (1976), 427 U.S. 132, 49 L. Ed. 2d 396, 96 S. Ct. 2548, and *NLRB v. Insurance Agents' Union* (1960), 361 U.S. 477, 4 L. Ed. 2d 454, 80 S. Ct. 419, is misplaced. In *Lodge 76*, the Supreme Court held that peaceful refusals to work are protected by Federal law. It also reaffirmed that "[p]olicing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States." (427 U.S. at 136, 49 L. Ed. 2d at 401, 96 S. Ct. 2551.) *NLRB v. Insurance Agents* did not involve a question of preemption but of

what the statute requiring good faith in collective bargaining allowed the board to regulate.

Finally, in *Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150* (1989), 180 Ill. App. 3d 39, 47-48, *cert. denied* (1989), 126 Ill. 2d 560 (U.S. appeal pending), this court held that intentional torts are not preempted by Federal law, stating:

"The issue is whether defendant, with actual malice, published a statement with knowledge of its falsity, or in reckless disregard for the truth. While truth or falsity is an important element in the tort of trade libel, it is certainly not the only issue to be considered. The issues of injury to reputation and defendant's mental state must also be considered. These issues are of only peripheral concern to the NLRB." *Lowe*, 180 Ill. App. 3d at 47-48.

We conclude, therefore, that the trial court did not err in holding that the plaintiffs' suit was not preempted by Federal law.

Next, the defendants contend that the trial court erred in holding that the defendants committed an intentional tort. They maintain that the trial court's findings of fact, in fact, support the opposite conclusion; specifically, they rely on the following statement by the trial court:

"I'm not saying that Mr. Holder intentionally said let the cement harden in the trucks but because of his acts and of the truck drivers, it hardened."

The comment to the Restatement (Second) of Torts section 8A provides as follows:

"All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." Restatement (Second) of Torts §8A, comment *b*, at 15 (1965).

The evidence is clear that the defendants knew what would happen if the drums ceased to turn with cement in them. The trial court's findings set forth several options which the defendants could have chosen to prevent the damage from occurring. The defendants chose to let the cement set in the drum. Therefore, regardless of whether the defendants "intended" the result, they knew that letting the cement sit in the drums without turning would result in damage to the trucks. Therefore, we hold that the trial court did not err in

concluding that the defendants had committed an intentional tort.

Next, the defendants contend that the trial court erred in entering judgment against the individual defendants.

■■ At the time the instant lawsuit was filed, an unincorporated association could only be sued by joining as parties all the members of the organization, since, at common law, such an entity could not sue or be sued in its own name. (See *American Federation of Technical Engineers, Local 144 v. La Jeunesse* (1976), 63 Ill. 2d 263.) However, the General Assembly amended the Code of Civil Procedure to allow voluntary unincorporated associations to sue or be sued in their own names. (See Ill. Rev. Stat. 1985, ch. 110, par. 2—209; *Rivard v. Chicago Fire Fighters Union, Local No. 2* (1988), 122 Ill. 2d 303, 306.) In *Rivard*, our supreme court, however, determined that the amendment was not retroactive. 122 Ill. 2d at 303, 305-12.

The defendants argue that the trial court "misread" the *La Jeunesse* doctrine, as having held the individual members liable for damages, but not the union, a decision defendants maintain is contrary to modern judicial decisions. It is clear that under *La Jeunesse*, which is applicable to this case because it was filed prior to the amendment, it is the individual members who can be sued, not the union itself.

■■ ■ Plaintiffs, while supporting the reasoning of the trial court here, appear to agree with the defendants that the decision here, compelled by *La Jeunesse* and *Rivard*, is contrary to modern judicial decisions. Plaintiffs suggest that this court overturn the decision in *Rivard*. However, the overruling of decisions of our supreme court is exclusively within the prerogative of such court. (*Benza v. Shulman Air Freight* (1977), 46 Ill. App. 3d 521, 525.) Plaintiffs also renew their suggestion made to the trial court that an order be entered attaching a portion of the member's dues paid each month until the judgment was satisfied. The trial court refused to do so. We will address that argument in plaintiffs' appeal.

Finally, defendants argue that the trial court erred in asserting jurisdiction over the individual members of the union by using a "class action device" of service by publication. Plaintiffs respond that defendants have been served, since service by publication made the action valid against each member, and, therefore, the case does not involve vicarious liability against unserved persons in a representative capacity.

■■ We note that the individually named defendants have appeared and have been represented by counsel throughout these proceedings, which conferred *in personam* jurisdiction over those defend-

ants for purposes of entering a money judgment against them. We note further that the union was dismissed as a party. A party who has not been injured by an alleged error has no right to argue for its reversal. (*Sullivan v. Harris Trust & Savings Bank* (1956), 8 Ill. App. 2d 397.) Since the named defendants' argument concerns those members of the union served by publication, it does not affect the named defendants who appeared and were represented in these proceedings, and, therefore, they cannot argue for the reversal of the damage award on that basis. Moreover, we do not find any indication in the record that the instant case was certified or treated by the trial court as a class action suit.

Defendants next contend that the trial court erred in awarding lost profits to plaintiffs. Defendants argue that the trial court held that plaintiffs had failed to prove any of the counts for lost profits and that the evidence showed that the plaintiffs' business was hampered by the strike, not the damage to the trucks.

Defendants are correct in that counts II and III, the only counts which the trial court found that plaintiffs had proved, did not contain a request for lost profits. However, the trial court went on to cite the testimony of the plaintiffs' accountant, Mr. Dickow, as to what Rockford's net profit would have been had the trucks been in service. In *Plesniak v. Wiegand* (1975), 31 Ill. App. 3d 923, the court stated that, where through an automobile accident a truck was put out of service, the loss of use of the vehicle included the repairs thereto, as well as the cost of renting a replacement truck, if feasible, or loss of net profits suffered by the rental business due to the loss of the use of the truck during that period of time, deducting from either of these measures the cost of operating the truck over that period of time. (*Plesniak*, 31 Ill. App. 3d at 932-33.) The record reflects that the trial court here did exactly that.

■■ ■ Moreover, the trial court relied on the testimony of Dickow as establishing the amount of the lost profits. Dickow's testimony was not contradicted by the defendants' evidence. However, defendants argue that the testimony was speculation. In *Klucznik v. Nikitopoulos* (1987), 152 Ill. App. 3d 323, 329, this court stated:

> "The law does not require a plaintiff to establish lost profits with mathematical accuracy. [Citation.] It requires only that the evidence tends to establish a basis for assessing the amount with reasonable certainty."

Given the absence of evidence to the contrary, we conclude that the trial court did not err in awarding lost profits to the plaintiffs.

■■ Finally, the defendants contend that the trial court erred in

awarding lost profits for the period after September 4, 1979. However, the defendants have failed to cite any authority for this argument on this issue in violation of Supreme Court Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)), and therefore, this issue is waived. *Rockford Memorial Hospital v. Schueler* (1988), 167 Ill. App. 3d 358, 362.

In their appeal to this court, plaintiffs raise the following issues: whether the trial court erred in failing to award exemplary damages; whether the trial court erred in failing to award prejudgment interest; whether the trial court erred in failing to award lost profits through the date of trial; and whether the trial court erred in failing to order an injunction to prevent defendants from damaging plaintiffs' property in the future.

In *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, our supreme court stated:

> "It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others [citation]. Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future. [Citation.] And, while the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law." (*Kelsay*, 74 Ill. 2d at 186.)

Because of their penal nature, the law does not favor punitive damages, and a court must not award them improperly or unfairly. Finally, they should be awarded only if the defendant's misconduct is above and beyond the conduct needed for the basis of the action. *Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 360-61.

Plaintiffs argue that the trial court abused its discretion when it failed to explain its reasoning not to award exemplary damages in the face of the defendants' conduct. Plaintiffs, however, cite no authority requiring the trial court to recite its reasons for not making an award of exemplary damages. Moreover, we are of the opinion that the following statement by the trial court adequately sums up its reasoning for the denial of exemplary damages:

> "[THE COURT]: In my opinion, that was an intentional tort committed by the Defendants. Now, why do I say that? Well, in my opinion, Mr. Holder was in a bind. He was caught in the

middle as it were. He took the short route, and I find nothing wrong with taking the short route to organize and ununionize [*sic*]. Nobody showed me to the contrary that's not proper. It did not work. Then when the Countrymans refused to negotiate, he had four trucks and four drivers on his hands at a coffee shop and said what do we do. Well, Mr. Holder said gee, I'll call up John Holand [*sic*], maybe he can intercede and get this done and get the trucks moving and so on. That didn't work. Now the four drivers are saying to Holder what do we do. He's saying wait a minute. In the meantime the cement is hardening in the trucks. I'm not saying that Mr. Holder intentionally said let the cement harden in the trucks but because of his acts and of the truck drivers, it hardened. What should they have done? I think they should have dumped the cement at Kirkland or gone back to Countryman and said here's your trucks and walked off the job. They had a right to withhold their services. They have a right to strike. I'm not saying they didn't have a right to do what they did, but they have no right to destroy or damage the Plaintiffs' truck and, as I said, I thought Mr. Holder was in a bind and the cement just hardened too quick. Intentional tort."

 While finding that the defendants had committed an intentional tort, the trial court did so on the basis not that Holder or the drivers set out to destroy plaintiffs' property but on the basis that the damage to the trucks was substantially certain to result from the acts of the defendants. The plaintiffs pleaded and proved that the acts of the defendants damaged their trucks, but evidence fails to show as a matter of law that the acts were done with elements necessary to justify the assessment of exemplary damages. Therefore, we conclude that the trial court did not err in failing to award exemplary damages to the plaintiffs.

 Next, plaintiffs contend that they were entitled to prejudgment interest. Section 2 of "An Act in relation to the rate of interest and other charges in connection with sales on credit and the lending of money" (Ill. Rev. Stat. 1987, ch. 17, par. 6402) provides as follows:

"Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance[;] on money received to the use of another and retained without the

owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment."

The pertinent portion of section 2, authorizing prejudgment interest when there has been "an unreasonable and vexatious delay of payment" by a debtor, has been interpreted as providing that " 'where property has been wrongfully taken or converted into money, and an action of trespass or trover may be maintained, interest may be properly recovered.' " (*Chicago Title & Trust Co. v. First Arlington Heights National Bank* (1983), 118 Ill. App. 3d 401, 412, quoting *Illinois Central R.R. Co. v. Cobb, Blaisdell & Co.* (1874), 72 Ill. 148, 153.) Interest may be awarded only if a debtor/creditor relationship exists, either at law or in fact. (*North Shore Marine, Inc. v. Engel* (1980), 81 Ill. App. 3d 530.) Moreover, interest may be awarded only if the claim is liquidated or readily obtainable. *Spagat v. Schak* (1985), 130 Ill. App. 3d 130.

None of the cases cited by the plaintiffs in support of their request for prejudgment interest involves property damage. Plaintiffs were awarded damages for the destruction to the trucks, not on the basis of a trespass or a trover action against the defendants. Nor have plaintiffs attempted to explain why a debtor/creditor relationship existed between the parties prior to the entry of judgment in their case. Finally, we cannot agree with plaintiffs that the damages amount here was readily obtainable, given the amount and the expert nature of the testimony plaintiffs presented in order to prove their damages claim.

We conclude, therefore, that the trial court did not err in failing to award prejudgment interest.

Next, the plaintiffs contend they should have been awarded their lost profits from July 25, 1979 (date of the incident), up through the date of trial.

Plaintiffs presented the testimony of Carl Dickow, a certified public accountant. Dickow projected an income statement for Rockford based upon what it should have been able to sell in 1979 but for the disruption. Using the 1979 projected income statement, Dickow then used the actual expense experiences of Rockford contained therein to project growth through actual Rockford market experience in relation to Acme, another cement supplier.

In developing a projected income statement for 1980-86, Dickow utilized factors such as material costs, labor costs, payroll taxes, vehicle expense, fuel, licenses, and title, and leasing costs. Dickow predicted Rockford's net profits by year as follows: 1980—17%; 1981—16%; 1982—11%; 1983—14%; 1984-86—18%. Dickow was of the

opinion that Rockford would continue to grow based upon increasing client base due in part to its willingness to make deliveries on Saturdays and, as a result, factored in a 1% growth increase per year, which he termed "extremely conservative" given that Rockford was penetrating the market at a rate of 1% per month in 1979. Dickow also pointed to the entry of Atlas Ready Mix into the market just after the demise of Rockford as a fair measure that a market existed outside of the large construction area. In 1986, Atlas was pouring 10% of the market, and Dickow's projections for Rockford in 1986 were that it would have had 12% of the market that year. Atlas had also made a profit throughout the proceeding years.

For their part, defendants presented the testimony of Allan Miller of Acme to establish that, between 1982 and 1984, his company had been unable to make a profit and that, therefore, Rockford's projections that it could have earned a profit throughout the period would be factually hypothetical and unrealistic. The parties stipulated that Acme's profits were higher in the summer of 1986 than during the summer of 1985.

In rebuttal, plaintiffs presented the testimony of Dr. Glen D. Meyers, an economist, who opined that Acme's data was of limited value given that Acme's operations were affected by an operating engineers' strike in 1981 and Acme's business policy of accepting short-term losses but long-term profits by positioning itself as the largest supplier in the area by buying out the competitors. He also opined that the 1981 strike would have enabled Rockford to obtain new customers since it was better equipped to penetrate the market.

Plaintiffs also presented the testimony of contractors who after July 1979 took their business elsewhere because Rockford could not serve their needs but who would want to do business with Rockford if it reopened.

 In determining lost profits, our courts have consistently recognized certain limiting factors: first, since the loss of profits is not a matter ordinarily susceptible to highly detailed direct proof, inferential proof must be admitted to establish the amount of damages; and second, the assessment of damages by a trial court sitting without a jury will not be set aside unless manifestly erroneous. *Getschow v. Commonwealth Edison Co.* (1982), 111 Ill. App. 3d 522, 532.

On the issue of net profits, the trial court found as follows:

> "[T]hat in 1979 the Rockford Redi-Mix according to Dickow, and I take his expert testimony what the net profit would be, that to be $81,800 according to his calculations, and I am persuaded by his testimony. Now, from July 25th until September

4th those trucks were out of commission. I figure that's 41 days until September 4th when the evidence appears to me that the trucks could go back in business, were able to return on line. However, because September is fall, their business was, in my opinion, damaged until the end of the year, and I computed that as 119 days until the end of the year. That would be 160 days you were affected by the damage to the trucks."

██ It appears from the trial court's remarks that although it was persuaded by Dickow's testimony, the trial court believed that the loss of the trucks plus the off-season period was the real cause of the lost profits. Once the trucks were operational, there was no reason for Rockford not to be operational again and, therefore, there was no basis for an award of lost profits beyond the period outlined by the trial court no matter how accurate or persuasive Dickow's testimony was. It is true that plaintiff introduced testimony by general contractors that they would have continued to use Rockford but for other commitments made after Rockford could no longer service them. However, this testimony is controverted by the evidence that Atlas Ready Mix started up as a new company as Rockford shut down and did very well. Based upon all the evidence, the trial court could properly conclude that if Atlas could succeed in the marketplace, so could Rockford, and properly denied lost profits after the end of 1979.

Based upon the record before us, we cannot conclude that the decision of the trial court to deny lost profits after 1979 to plaintiffs was against the manifest weight of the evidence.

Finally, the plaintiffs contend that they are entitled to the issuance of an injunction restraining the defendants from damaging plaintiffs' property. Plaintiffs also request as part of their relief that this court should enter an order attaching $10 of the monthly dues paid by each union member until the judgment is satisfied.

Defendants have not responded to this issue, but pursuant to the dictates of *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, we will consider its merits.

██ Plaintiffs rely on *Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago No. 753* (1939), 371 Ill. 377. In that case, the supreme court held that nothing in the anti-injunction statute (Ill. Rev. Stat. 1937, ch. 48, par. 2a) prohibited the issuance of an injunction to restrain boycotting or interfering with contractual relationships or the right to do business generally. Therefore, an injunction was properly issued when the evidence showed that the defendant had intentionally interfered with plaintiffs' business.

The trial court denied injunctive relief on the basis that Rockford

was no longer in business. Even though plaintiffs have not dissolved the corporation, Rockford has not operated a cement contracting business since 1981. Plaintiffs have cited no cases wherein a party has been enjoined from damaging a business that is nonfunctioning as one. Moreover, plaintiffs failed to cite any authority for the attachment of the dues of union members. Therefore, we conclude that the trial court did not err in failing to provide injunctive relief to the plaintiffs or in failing to order an attachment of the dues of the union members.

For all of the foregoing reasons, the judgments of the circuit court are affirmed.

Affirmed.

UNVERZAGT, P.J., and DUNN, J., concur.