2015 IL App (2d) 131291
No. 2-13-1291
Opinion filed September 17, 2015

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10-CF-229 |
| MARIO CASCIARO, | ) ) ) | Honorable Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hutchinson and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1   Following a jury trial in 2013, defendant, Mario Casciaro, was convicted of felony murder in the death of Brian Carrick. He appeals. This was defendant's second jury trial. The first resulted in a mistrial after the jury was unable to reach a verdict. Because the State failed to prove defendant's guilt beyond a reasonable doubt, we reverse.

¶ 2                    I. BACKGROUND

¶ 3                    A. Val's Foods

¶ 4   On December 20, 2002, 17-year-old Carrick disappeared. He was last seen at Val's Foods, a grocery store co-owned by defendant's father in Johnsburg, Illinois, where Carrick was employed as a stock boy. Carrick's mother reported him missing on Saturday, December 21,

2002. He was listed on the missing person's report as being five feet nine inches tall and 135 pounds. The following is taken from the evidence presented at the second trial.

¶ 5     On Sunday, December 22, 2002, the police determined that a crime had been committed in the area of the produce cooler at Val's Foods. Later that day, Sergeant Patrick Phillips, a crime scene investigator with the Illinois State Police, processed Val's Foods for evidence. Before detailing Phillips' testimony, we provide a brief description of the premises.

¶ 6     The main entrance was on the west side of the building, fronting Johnsburg Road. There were exit doors at the northeast and southeast ends of the building. From the main entrance, the produce section was located to the south. The vegetable display was along the south wall. East of the vegetable section, on the south side of the building, was the "produce room." That room had a west doorway, hung with a clear plastic curtain, to the public area, and an east door leading into a metal produce cooler. The produce cooler also led into a hallway running along the south side of the building and extending to the southeast exit door. A "tool room" was located off that hallway, just to the east of the produce cooler. From the southeast exit door, a long hallway ran north and south along the east side of the building. At the north end was an overhead delivery door and a truck dock area outside. An employee break room was located on the north side of the building, to the left of the overhead delivery door.

¶ 7     Phillips photographed the interior and exterior of Val's Foods. The photographs depict the following: blood spatter low (beneath the level of the produce cooler's door handle) on the north wall of the south hallway, between the tool room and the produce cooler; a bloody fingerprint on the produce cooler's exterior door handle (hallway side) and blood on the exterior of the produce cooler's door; blood on the produce cooler's door jamb; blood on the inside of the produce cooler's door, slightly above the handle and toward the center of the door; blood on the

bottom of the inside of the produce cooler's door; a metal rack stacked with boxes of "New Star Premium Celery," inside the produce cooler; blood smears on the celery boxes; blood on a leg of the metal rack holding the celery boxes; a pool of water on the produce cooler's floor flowing toward the north wall of the cooler; the inside of the southeast exit door; the exterior of the southeast exit door; a dumpster on the north truck dock; and cardboard boxes, some bloody, within the dumpster.

¶ 8    Phillips testified that the blood spatter in the hallway between the tool room and the produce cooler, consisting of approximately 20 bloodstains, came from blood traveling through the air and striking the wall in a downward direction, angling slightly to the right.  He testified that the blood spatter was not caused by an impact or a drip but could have been caused by a moving person who was bleeding or by blood being cast off a swinging object.  Phillips testified that, because the blood spatter was so low on the wall, it did not come from someone who was struck in the head while standing.  Phillips admitted that, based on the blood spatter's location, he did not know what had happened.

¶ 9    Phillips explained that, in contrast to the blood spatter's individual droplets, the smears on the celery boxes inside the produce cooler were "transfer" patterns, caused by a bloody object or bloody clothing rubbing against the boxes.  Phillips testified that he also observed a droplet of blood and a patch of hair on the produce cooler's floor, between the cooler door and the metal rack.  He collected specimens, including from the southeast exit door, that he submitted to the Illinois State Police Crime Laboratory for analysis.  According to Phillips, there were dumpsters in the area outside the southeast exit door, but they contained nothing of evidentiary value. Phillips had the dumpster from the north truck dock towed to a facility where it could be closely

examined. Although Phillips did not believe that a body had been in the dumpster, he found blood on some of the cardboard from the dumpster, which he submitted to the crime laboratory.

¶ 10 The crime laboratory established a DNA profile for Carrick. That profile matched the blood spatter found on the north wall of the hallway between the tool room and the produce cooler. Carrick's blood was also on the bottom of the interior of the produce cooler's door, on the leg of the metal rack, on the celery boxes in the cooler, and on some of the cardboard from the dumpster. The droplet of blood on the floor of the produce cooler was also Carrick's.

¶ 11 There was blood from a second person on the produce cooler's door jamb, on the southeast exit door, and in the bloody fingerprint on the produce cooler's door handle. The second person was identified through DNA analysis as Robert Render, a stock boy at Val's Foods, whom witnesses placed at the store on the day that Carrick disappeared. The parties stipulated that the bloody fingerprint on the cooler's door handle was Render's. Render quit his job at Val's Foods on December 22, 2002, and was reported as a runaway from home on December 28, 2002. Johnsburg police chief Keith Von Allmen testified that he spotted Render after the runaway report and that Render fled from him. When Von Allmen "nabbed" him, Render had drug paraphernalia in his possession and blood on one of his shoes (later determined to be Render's own blood). Render's father testified that Render died in May 2011. According to Render's father, Render had a habit of chewing his fingernails.

¶ 12 Defendant, who was the "unofficial" manager of the stock boys when Carrick disappeared, was arrested for Carrick's murder in February 2010. According to a number of witnesses, defendant dealt small amounts of marijuana.

¶ 13 B. The Indictment and the First Trial

¶ 14   On February 25, 2010, a grand jury indicted defendant on five counts of first-degree murder and one count of concealment of a homicidal death (720 ILCS 5/9-3.1(a) (West 2002)). Counts I and II charged felony murder (720 ILCS 5/9-1(a)(3) (West 2002)) in that defendant, or one for whom he was legally accountable, while committing or attempting to commit the forcible felony of intimidation (720 ILCS 5/12-6(a)(1), (a)(2) (West 2002)), struck Carrick in the head, causing his death.   Count III charged defendant with felony murder (720 ILCS 5/9-1(a)(3) (West 2002)), as principal or in the alternative by accountability, the predicate forcible felony being unlawful restraint (720 ILCS 5/10-3 (West 2002)).   Counts IV and V charged defendant with felony murder, as principal or in the alternative by accountability, the predicate forcible felony being mob action (720 ILCS 5/25-1(a)(1), (a)(2) (West 2002)).   The case was tried between January 24, 2012, and February 1, 2012, when the court declared a mistrial after the jury failed to reach a verdict.

¶ 15                    C. The Second Trial: State's Case-In-Chief

¶ 16   Defendant's second jury trial commenced on March 26, 2013.   The State proceeded only on count I of the indictment, felony murder predicated on intimidation.   The State dismissed the remaining counts.

¶ 17                    1. The Events of December 20, 2002, at Val's Foods

¶ 18   The stock boys who were present at Val's Foods on Friday, December 20, 2002, were defendant, Carrick, Eddy Carrick (Carrick's brother), Render, Shane Lamb, and Jacob Kepple. Some of the stock boys were local high school students.   Defendant was in his first year at McHenry County College.   Lamb had been committed to the Illinois Department of Corrections, juvenile division, at age 14 for attempted murder, and had spent most of his high school years incarcerated.   The evidence showed that defendant "fronted" small amounts of marijuana to both

Carrick and Lamb, which they then sold. They were supposed to use their proceeds to pay defendant.

¶ 19    The Carrick family lived across the street from Val's Foods. On that Friday, Carrick's 12-year-old sister, Bridget, got home from school at about 3:15 p.m. Carrick was in his room. According to Bridget, between 4 p.m. and 4:30 p.m., he went to Val's Foods and returned home with a frozen pizza and a two-liter bottle of Mountain Dew. At 5:30 p.m., Bridget, Carrick, and their sisters Therese and Mary Kate were all talking in the living room. At 6:30 p.m., when Bridget, Therese, and Mary Kate left the house, Carrick was on his way upstairs to his room.

¶ 20    Eddy testified that he arrived at Val's Foods at approximately 4:10 p.m. Because it was Friday, employees came in to collect their paychecks. Soon after Eddy arrived, he saw Carrick come into the store to get his paycheck. According to Eddy, Carrick did not stay inside the store very long. On cross-examination, Eddy testified that he saw Lamb in the store at about 5 p.m. According to Eddy, he and defendant got a pizza, which they began eating at 6:45 p.m. in the break room. They were alone in the break room until 7 p.m., when Dan Stittgen, a butcher, came in. Eddy collected the carts at the front of the store at 7 p.m. and finished at 7:15 p.m. or 7:20 p.m. Eddy had furnished those times to the police in a statement he gave shortly after December 20, 2002, when, he said, his recollection was better than at trial. After Eddy got the carts, he helped close the produce department while defendant swept the floors and Render mopped. Eddy recalled that at 8 p.m. the employees all gathered at the front of the store and walked out after an alarm was set. He noticed nothing unusual that evening. On redirect examination, Eddy testified that he was not near the produce cooler for the 20 or 25 minutes that he was gathering carts.

¶ 21    Peter DePierro cleaned the meat department.  At trial, he was 90 years old and in a wheelchair.  Prior to his testimony, DePierro handed the court a written statement from his doctor saying that he suffered mild cognitive impairment.  He testified that he could remember things that he saw but not things that he heard.  According to DePierro, he saw defendant, Lamb, and a third person talking to Carrick by the meat department sometime between 5 p.m. and 7 p.m.  He could not hear them, nor could he say whether they were arguing, although they were waving their arms.  On cross-examination, he became confused.  He did not remember what Lamb looked like.  He asked defense counsel if the identity of the third person was a secret.  His impairment became so evident that the parties stipulated to his prior testimony rather than continue with cross-examination.  Those transcripts were not made part of the record on appeal.

¶ 22    Dominick Carpanzano, a meat cutter and a "good acquaintance" of DePierro's, testified that DePierro told him about seeing an encounter behind the meat department between defendant and Carrick that involved "waving arms and stuff."  Carpanzano conjectured that this occurred sometime between 6 p.m. and 7 p.m.  Carpanzano testified that DePierro told him that he saw only two people—defendant and Carrick—and did not mention Lamb or another person.

¶ 23    Shannon Ustanko was a cashier who recalled that Carrick came into the store between 6:45 p.m. and 7 p.m. and went to the break room, where defendant was eating pizza.

¶ 24    Seanna Barroso worked from 4 p.m. to 7:30 p.m. in the deli.  She testified that Carrick came by the deli about 6 p.m. or 6:30 p.m. to see if her garbage needed emptying and to sell the deli workers "some weed."

¶ 25    Stittgen testified that he worked until 3:57 p.m.  When he left Val's Foods, he saw Carrick standing outside the main entrance talking to defendant.  It appeared to be a friendly conversation.  Stittgen testified on cross-examination that he returned to the store at about 6:30

that evening, or a little thereafter, to pick up his paycheck. He went into the break room, where Eddy and defendant were eating pizza. According to Stittgen, he stayed in the break room until after 7 p.m., when he left and went home. While he was in the store that evening, he did not see Carrick or Lamb.

¶ 26 When Kristin Freund, a cashier, arrived for work at 4 p.m., she saw Carrick in the grocery store's parking lot. She attempted to start a conversation with him, but he seemed distracted and busy with something else. She noticed nothing unusual during her shift, which ended at 8 p.m. She described Lamb as a "big, husky, tall, broad shoulders kind of guy." She described Carrick as a "little guy," smaller than she. She testified that she did not see Lamb that day.

¶ 27 Melissa Kreutzer worked in the deli. She recalled seeing Carrick in the store aisles talking with friends that afternoon. She did not recall seeing defendant between 6:30 p.m. and closing at 8 p.m. Although she did not have a good recollection of that day, she testified that nothing unusual occurred during her shift.

¶ 28 Lauren Smith was also a cashier. She testified that, according to her prior statements, she saw Carrick enter the break room at 6:45 p.m. At that time, defendant and Eddy were also in the break room, eating pizza. Carrick asked where Render was and then left. Smith stayed in the break room for 15 minutes with defendant and Eddy. She testified that everything was cordial, normal. She did not recall seeing defendant when the employees gathered at the front of the store for closing.

¶ 29 Kepple described Carrick as 5 feet 10 inches tall and 130 pounds. He described Lamb as six feet tall and 185 pounds. Kepple arrived at work at 4 p.m. Between 4:30 p.m. and 5 p.m., he saw Carrick near the break room talking to Lamb, having a normal conversation. Kepple

testified that he saw defendant in the break room with Eddy at 6:30 that evening, eating pizza. At about that time, Kepple stocked the beer cooler and then at 7:10 p.m. took a shortcut through the produce cooler to the back of the store. Kepple testified that there was a "large pool" of water on the produce cooler floor, which was unusual. Near the water, he saw a Mountain Dew bottle cap (later determined to contain Carrick's DNA along with unknown DNA), which he picked up because the inside of the cap advertised a free 20-ounce Pepsi. When Kepple exited the back door of the cooler into the hallway, he saw "some trails" of water that appeared to have been left by a mop bucket. He did not see any "red tint" or blood inside the produce cooler as he passed through, although he was not paying attention to everything in the cooler. According to Kepple, he helped Eddy close the produce department that evening, and he went back into the cooler at about 7:30 p.m. He testified that it was in the same condition as when he passed through earlier. Kepple gave Render a ride home from the store that evening. According to Kepple, Render was not bleeding and was not nervous or acting "unusual."

¶ 30    On cross-examination, Kepple testified that Render had been missing for an hour or two prior to 7 p.m. Then, when Kepple next noticed him, Render was standing outside the mop room. Kepple also corrected the timeline of events on cross-examination. He testified that he saw Eddy and defendant leaving the store to get pizza at 6:30 p.m. and that he saw Eddy and defendant in the break room eating pizza a little before 7 p.m. Kepple testified that it was 7 p.m. when he first walked through the produce cooler. According to Kepple, he did not see Lamb then, nor did he see any blood on the door handle or on the wall outside the produce cooler. Kepple testified that he next was inside the produce cooler at 7:25 p.m. or 7:30 p.m. and that Lamb was not there then. Throughout his shift, Kepple saw defendant in various locations

throughout the store; however, the only time that he saw Lamb was at 5 p.m., when Lamb was talking to Carrick near the break room.

¶ 31                                  2.  Defendant's Statements to Law Enforcement

¶ 32   Defendant made four statements to law enforcement.  We recount those statements in chronological order, rather than the order in which the witnesses testified, for purposes of clarity. On December 23, 2002, Von Allmen interviewed defendant.  Defendant stated that he had seen Carrick in the store two times on the night Carrick disappeared, but he denied speaking to Carrick.  Defendant stated that he had ordered a pizza around 6 p.m. that evening and that he and Eddy ate from 6:45 p.m. to 7 p.m.  Defendant stated that he did not remember Lamb coming into the store while they were eating pizza.  Von Allmen, accompanied by a Crystal Lake police officer, interviewed defendant again on January 2, 2003.  Defendant stated that no one was injured in the store on December 20, 2002, and that, had someone been injured, it would have been reported and the injured person would have been treated.  Defendant further stated that from 6 p.m. to 6:30 p.m. he and Eddy were stocking milk.  Defendant saw Carrick walking from the front of the store, and defendant asked Carrick why he was there.  Carrick said that he was looking for Render.  Shortly thereafter, defendant saw Carrick and Render talking near the break room.  Defendant told Von Allmen that from 6:30 to 6:45 he went to pick up the pizza, but, because it was not ready, he went to a dry cleaner to "hit on" a girl named Rachel.  Defendant then got the pizza and returned to the store.  At 6:50 p.m., defendant and Eddy were eating the pizza in the break room when Stittgen walked in.  Defendant stated that at about 7:05 p.m. he and Eddy finished the pizza and started closing the store.  Defendant swept while Eddy went to get the carts.  Defendant stated that he saw Render with a mop and a bucket at about 7:15 p.m. At about 7:20 p.m., defendant saw Eddy cleaning up the break room.  Defendant put meat away,

and then at 8 p.m. the employees gathered at the front of the store to leave. Defendant stated that he went home with his parents. Von Allmen attempted to speak with defendant again on January 3, 2003, but defendant said that he was busy at the store. Von Allmen identified a receipt for a pizza from Tom's Café that was time stamped 6:07 p.m., although he did not know if that was when the pizza had been ordered or purchased.

¶ 33    FBI special agent Casey Solana interviewed defendant on December 18, 2003. Defendant stated that he worked the 4 p.m. to 8 p.m. shift the day that Carrick disappeared. Defendant saw Carrick inside the store purchasing frozen pizzas, and he spoke to him. When Solana asked defendant for information about Carrick's disappearance, defendant told Solana that Lamb was capable of being involved. Defendant also said that he did not care for Render, whom he described as a weasel and a thief. Sometime after Carrick purchased the frozen pizzas, he came back into the store and asked defendant to page Render over the PA system. Defendant told Solana that he left Carrick, remained in the back of the store, and never saw Carrick again. Defendant stated that he placed a telephone order for a pizza. He then walked a short distance in the same strip mall where Val's Foods is located to a dry cleaner, where he talked with a girl for about 10 minutes. Then he picked up the pizza from Tom's, which was also in the same strip mall. Defendant stated that he left with the other employees at closing time.

¶ 34    FBI supervisory special agent John Molnar interviewed defendant on January 13, 2005. Defendant told Molnar that he had no information about any injury Carrick might have suffered. Defendant also stated that he did not know what happened to Carrick. However, defendant told Molnar that he thought a former store manager named Angelo must have had Carrick killed in order to ruin Val's Foods, because Angelo now ran a restaurant down the road from the grocery store. According to Molnar, defendant also speculated that the blood in the produce cooler area

was planted as part of a setup, although defendant did not know who would have planted the blood. Molnar described defendant as "arrogant," "confrontational," and at times "disinterested." On cross-examination, Molnar testified that defendant denied involvement in Carrick's disappearance.

¶ 35                                    3. Shane Lamb's Testimony

¶ 36    The following was established through Lamb's testimony at the second trial. Lamb, 28 years old, had been incarcerated in the Illinois Department of Corrections as an adult five times for "aggravated batteries and cocaine." At age 14, he was committed to the juvenile division of the Department of Corrections for attempted murder. The prosecutor asked Lamb where he went to high school. Lamb answered: "I was in juvenile prison all through high school pretty much." At the time of trial, he had recently been released from prison, where he was serving time for a parole violation. On January 22, 2010, the State had granted Lamb full immunity for Carrick's death. In addition, the State had reduced the time Lamb would spend in prison on cocaine charges that were pending. Lamb testified that he had been looking at possibly 30 years' incarceration. The State had been offering him 12 years' incarceration, which it reduced to 6 years after he signed the immunity agreement. He served three years.

¶ 37    On cross-examination, Lamb admitted that following the grant of immunity he had written numerous letters to the prosecutor, begging for favors in return for his testimony. He sought favors such as transfers to better prisons; additional "good time"; work release; reduction of his sentence to five years; expungement of his attempted-murder adjudication; release from house arrest for a fight in the penitentiary; and vacatur of a parole violation. Lamb wrote the prosecutor: "I've done everything that you've asked me to do, now I need you to come through"; "you told me I would be taken care of"; "please pull some strings"; "I thought we had an

understanding"; and "I have to tell [prison authorities] so many lies about everything that I'm starting to get confused."

¶ 38    According to Lamb, he was buying marijuana from defendant in 2002. Defendant would "front" him an ounce of "weed," and he would give defendant $125 when he sold it. Carrick had the same arrangement with defendant; however, Carrick was not a successful dealer, because he was a "nice kid" who would give the marijuana away to friends.

¶ 39    Lamb testified that he cashed his paycheck at Val's Foods at 4 p.m. on Friday, December 20, 2002. He learned from defendant then that Carrick had cashed his check, too, and had not paid defendant money he owed. Lamb went to a party where he was drinking alcohol and smoking "weed," when defendant called him and told him "to come talk to [Carrick] at the store" about money Carrick owed defendant. Lamb agreed to talk to Carrick, because if Carrick did not pay the money he owed defendant, defendant would stop fronting Lamb weed.

¶ 40    At the store, Lamb found defendant and Carrick in the produce room. They were arguing about the money. Then Lamb started arguing with Carrick about the money, "and things got kind of loud." Defendant said, "There's [*sic*] customers," so Lamb "muffed" Carrick by placing the heel of his hand against the side of Carrick's face and shoved him into the produce cooler. Defendant was behind Lamb. Then Lamb and Carrick started arguing inside the produce cooler. Defendant was still right behind him, although defendant was not doing or saying anything. Lamb testified that it was he who was arguing with Carrick. When Carrick said that he did not have the money, Lamb lost his temper and hit Carrick. Lamb thought that he knocked Carrick out, because Carrick fell straight back, "right in front" of him. Then, he testified, defendant told him "to get out of the store."

¶ 41    Lamb left the produce cooler and went by the break room on his way out of the store. Lamb saw Render coming out of the "butcher's doors" and then saw defendant talking to Render.  Lamb went back to his party.  The next day, Saturday, he went to work and thought nothing of the incident with Carrick, as "it wasn't a big deal at that minute."  He continued to work at Val's Foods a short while longer, until his parole officer made him go to "rehab" for failing 11 drug tests.  He was in rehab for three months and then was resentenced to the Department of Corrections.

¶ 42    Lamb testified that the authorities had spoken to him in the years since Carrick's disappearance.  In 2005, when he was drunk and in the De Kalb County jail, he asked to talk to the FBI.  However, he testified that "I don't remember what I was even talking about that day." The next day, someone told him that he had asked to see the FBI.  When asked on direct examination, "Why did you do that?" he answered, "I have no clue."  Lamb testified that he did not speak with the FBI while he was in the De Kalb County jail.

¶ 43    Lamb testified that, in 2007, he was called before a McHenry County grand jury and was asked if he was involved in Carrick's disappearance.  He testified that he lied to the grand jury, saying, "I wouldn't tell them anything to incriminate myself."  Lamb also testified that he lied to two FBI agents when he denied that he had anything to do with what happened to Carrick.  He further testified that when he was arrested on cocaine charges in 2009 he decided to tell the McHenry County State's Attorney's office "the truth."  However, he did not tell the prosecutors anything until he received the signed immunity agreement in 2010.

¶ 44    On cross-examination, Lamb recalled that, in the summer of the year before the trial, he was at a bar called Blarney's Island.  He was on parole.  He was drinking.  An "older guy" told him that defendant wanted to talk to him.  Defendant "had a whole group of people with him."

Defendant wanted him to talk to a McHenry County lawyer named Ed Donahue, who happened to be sitting at a table at Blarney's Island. However, Lamb testified, he refused to deal with the lawyer until the following Monday and left the bar. Lamb denied that while he was at Blarney's Island he stated that the prosecutor had coached him on what to say at the first trial. On cross-examination Lamb also denied that he told people at Blarney's Island, in Donohue's presence, "I'm just going on what they [prosecutors] said to say." Lamb further denied telling people at Blarney's Island that "they" came at him with a murder indictment and that, if he said what prosecutors wanted him to say, he would be "all right." Sometime after he was at Blarney's Island, Lamb got arrested for participating in a bar fight. As a consequence, his parole was revoked and he served 87 more days in prison.

¶ 45    On cross-examination, Lamb testified that he returned to Val's Foods on the evening of December 20, 2002, at about 6:45 p.m. He went to the store because he thought that, if Carrick did not pay defendant, defendant would "cut off the weed that he was fronting" Lamb. He went to the store because the arrangement was good for him. Defendant did not tell him to threaten Carrick. Before December 20, 2002, defendant had asked him to get some stereo equipment from Chris Amen, because Amen owed defendant money for marijuana. Lamb did not do that for defendant.

¶ 46    Lamb testified that he got into an argument with Carrick when he returned to the store on December 20, 2002. Defendant did not tell him to "muff" Carrick; he decided on his own to do that. Then, inside the produce cooler, Lamb got "pissed," lost his temper, and punched Carrick. Defendant did not tell him to do that.

¶ 47    Lamb testified that he was sure that what happened between him and Carrick took place in the produce room and then inside the produce cooler.  Nothing occurred in the south hallway outside the produce cooler.

¶ 48    Lamb admitted on cross-examination that his lying to the grand jury had resulted in "zero" consequences to him.  Lamb also agreed that he could say anything about what happened to Carrick, including that he shot him with a gun, and he would be "good"; he could hold up the "immunity card."  Lamb agreed that he obtained "a total free one" from the prosecution on Carrick's death.  He agreed that, if he had killed Carrick, he "got zero [punishment] for that."

¶ 49    Lamb testified about a statement that he gave to the police and prosecutors immediately following the inking of the immunity agreement.  He said in that statement that he and Carrick "walked" into the cooler; Lamb did not say that he pulled or grabbed Carrick.  At trial, he explained that he had "just left out" "that little part" about muffing Carrick into the cooler.  He testified, "that wasn't an important part at the time"; "it didn't matter at the time"; and "it was like a small minor detail."  Lamb admitted that before a grand jury in 2010 he testified that he "could have" punched Carrick outside the cooler, or tossed him into the cooler.  He also told the grand jury that he hit Carrick with a closed fist three to five times.  At trial, Lamb testified that he had no idea if Carrick was dead.

¶ 50    Lamb admitted that he had previously told the FBI "whatever[,] to get the heat off [of] the store and me."

¶ 51    On redirect examination, the prosecutor asked Lamb if Lamb and he had ever talked when someone else was not in the room, and Lamb answered no.  Then the prosecutor asked: "Do I strike you as being the type of person that would be stupid enough to meet with you alone?"  Lamb answered "no."

¶ 52                    4. Christopher Amen's and Allen Lippert's Testimony

¶ 53    Christopher Amen, also known as Priest, was a convicted drug felon.  He sold ecstasy, cocaine, and "everything under the sun."  He testified under a grant of immunity for any drug transactions related to the Carrick case.

¶ 54    Amen was not defendant's friend but had been his associate in selling marijuana in 2002.  Amen also knew Lamb from partying with him.  According to Amen, in October 2002, defendant told him that Lamb was going to be defendant's "intimidator" or "muscle" if someone needed to be roughed up or money needed to be collected.

¶ 55    According to Amen, everybody was aware of Carrick's disappearance.  Approximately five years after Carrick disappeared, Amen had a conversation with defendant at a bar.  According to Amen, they were chit-chatting and making "smart remarks" and "dumb comments"—like "taking shots at [each] other"—when Amen told defendant "you're not a tough guy" and defendant retorted "I make people disappear," to which Amen responded "you didn't make me disappear."  On cross-examination, Amen testified that he did not like defendant, because he thought that defendant was a snitch who had set him up on a drug deal.  Amen further testified that he had never witnessed Lamb acting as an "enforcer."

¶ 56    Allen Lippert had been a close friend of defendant's in 2002.  When he testified at trial, they were no longer friends.  In the fall of 2006, he and defendant went to a couple of bars in Johnsburg, and after the second bar closed defendant drove Lippert and another friend, Steven Denson, home.  They dropped Denson off and were alone in the car when Lippert told defendant, "I know you told [Lamb] to kill [Carrick.]"  According to Lippert, defendant said, "It wasn't even like that."  Defendant said that Lamb was supposed to threaten Carrick, but that some kind of accident happened and "things got out of hand."  Defendant said that defendant's cousins

eventually took Carrick's body to a river in Iowa. Lippert told his parents and his girlfriend of the conversation but did not tell law enforcement until a few months later, when he was in custody for DUI.

¶ 57 Lippert admitted on cross-examination that he had consumed up to 12 beers and 2 shots the night that he had the conversation with defendant. He was also drunk when he gave to an officer a written statement that defendant's cousins moved the body to Iowa. He amended his direct testimony to say that he was now sure that it was Lamb who had taken the body to Iowa, even though he had told the FBI and the grand jury that it was defendant's cousins who had taken the body to Iowa. He also recalled that defendant said that he was not present when Lamb killed Carrick. Lippert told the FBI that his conversation with defendant "seemed like a dream" and that it was possible that he and defendant were just talking over theories about what had happened to Carrick. In conversations he had with defendant from 2002 to 2006, defendant had denied that he knew what happened to Carrick.

¶ 58                        5. Defendant's Grand Jury Testimony

¶ 59 By agreement, the prosecutor read defendant's 2007 grand jury testimony into the record. The following is a summary. Defendant denied that Carrick owed him money or that he was angry with Carrick. Defendant denied being a drug dealer. He did not direct Lamb, whom he knew had a reputation for violence, to scare Carrick, nor had he ever directed Lamb to scare anyone. Defendant denied knowing what happened to Carrick. He denied that he helped to dispose of Carrick's body or that he had ever told anyone where Carrick's body was. He denied that he told Lippert that he directed Lamb to scare Carrick or that he asked his cousins to dispose of the body.

¶ 60    Defendant saw Carrick come into the store to cash his paycheck about 4:30 p.m. on the day he disappeared.  Later that evening, while defendant was stocking yogurt, Carrick passed by him in the aisle, and that was the last time he saw Carrick.  Defendant saw Render in the store that evening, and he was not bleeding.  Defendant did not have a conversation with Carrick near the produce cooler that evening.  Defendant left the store at 8:15 p.m., and he thought that he went home and showered before he attended a party at his friend Jarad Karlen's house.

¶ 61                6. Stipulations and the Motion for a Directed Verdict

¶ 62    The record contains the following trial stipulations: (1) defendant's telephone records indicated that there were no standard telephone calls or "chirps" from defendant's phone to any number listed to Lamb or any of Lamb's family members between December 20, 2002, at 11:28 a.m. through December 21, 2002, at 10:30 a.m.; (2) the alarm at Val's Foods was set on Friday, December 20, 2002, at 8:03 p.m. and was deactivated on Saturday, December 21, 2002, at 7:44 a.m., without any intervening disruptions; and (3) FBI special agent Cherry interviewed Lippert on August 13, 2008, about statements defendant allegedly made to Lippert in October 2006. According to Cherry, Lippert vacillated between saying that defendant's statements that Lamb killed Carrick and that Carrick's body was taken to Iowa were accurate and correct and saying that he had a lot to drink on the night of the alleged statements and was not sure.  Lippert told Cherry that the whole conversation with defendant seemed like a dream and that it was possible that he and defendant were simply discussing several theories that they had heard about Carrick's disappearance.

¶ 63    At the close of the State's case, defendant moved for a directed verdict on the grounds that intimidation could not be a predicate for felony murder and that, if it could, Lamb's testimony did not establish the elements of intimidation.  The court denied the motion.

¶ 64            D. Defendant's Case-In-Chief and the State's Rebuttal

¶ 65    Maria Casciaro, defendant's mother, testified that defendant arrived home after work on December 20, 2002, around 8:15 p.m. The family was eating dinner. Defendant "picked" at his food, because he ate pizza at the store earlier. Defendant showered and left the house. She did not notice anything unusual about him that evening.

¶ 66    On December 20, 2002, Karlen was home from college for the Christmas holiday. Karlen spoke with defendant on the telephone around 8 p.m. that evening, and then they attended a party at Karlen's brother's house. Karlen thought that defendant stayed several hours. He observed nothing unusual about defendant that evening.

¶ 67    Donohue testified that he was at Blarney's Island on the evening of August 2, 2012. He was speaking to defendant, whom he knew, and Denson, when Lamb approached them. Lamb stated to defendant: "I only said what Mick Combs [the prosecutor] said when I was in the lockup." Lamb also stated: "If your lawyer would have asked me the right question, I would have said that." Lamb's demeanor was aggressive, and defendant was trying to ignore him. Donohue indicated to Lamb that he was being inappropriate, but Lamb persisted: "You got to help me out, Donohue. You guys got to help me out." Donohue told Lamb to make an appointment at his office, which Lamb never did. Within a couple of days after that incident, Donohue told Combs about it. Then Donohue spoke with an FBI agent.

¶ 68    On cross-examination, Combs established that he and Donohue were friends and that Donohue regularly negotiated cases with Combs's office. Then he asked Donohue: "You don't think I coached Shane Lamb; do you?" "Are you telling these Ladies and Gentlemen that I coached Shane Lamb on what to say? Is that what you are saying?" Donohue answered: "Knowing you, no, I don't think that conversation took place." Combs asked: "Do you really

think that I was *** coaching Shane Lamb on what to say? Do you really think that, Mr. Donohue?" Donohue answered, "I already stated that I didn't think that." On redirect examination, Donohue clarified that he was testifying to what Lamb had said, which he clearly remembered.

¶ 69    Michael McCleary, a State's Attorney's investigator, was called by defendant to impeach Amen's testimony that defendant told Amen that he "makes people disappear." McCleary testified that Amen told him only that he had "overheard" defendant say that he makes people disappear.

¶ 70    Denson testified that he was with defendant at Blarney's Island on August 2, 2012, while they were having a conversation with Donohue. Lamb was present and said to defendant: "I don't have money like you." Lamb also told defendant that he was facing 45 years' incarceration and that "they came at me with a murder indictment." Lamb stated: "I'm just going on what the prosecutor said to say" and "[i]f I go along with what the prosecutors want me to say, then I'll be all right."

¶ 71    Denson testified that he stopped being friends with Lippert in 2005 and that he was never with Lippert and defendant at bars in 2006.

¶ 72    On cross-examination, over defendant's objection, the prosecutor elicited Denson's opinion that Lamb was not truthful. Upon further questioning in that vein, Denson did not recall telling Von Allmen that defendant would "beat" the murder charge. Denson did not recall saying rhetorically to Von Allmen, "who is going to believe [Lamb][?]"

¶ 73    Defendant rested, having elected not to testify, and, over defendant's objection, the State called Von Allmen in rebuttal. According to Von Allmen, Denson stated to him that he knew

that defendant would "beat [the murder charge]." Von Allmen testified that Denson said "who's going to believe [Lamb][?]"

¶ 74    Following closing arguments and jury instructions, the jury retired to deliberate. The jury found defendant guilty of first-degree murder, and the trial court denied defendant's extensive posttrial motions in a written order on September 24, 2013. The court sentenced defendant to 26 years in the Department of Corrections. Defendant filed a timely appeal.

¶ 75                                          II. ANALYSIS

¶ 76    Defendant contends that he was not proved guilty beyond a reasonable doubt. He first argues that, even if the jury was entitled to credit the State's evidence, it was insufficient to prove defendant's guilt of the predicate forcible felony of intimidation. Defendant then argues that the jury was not entitled to credit the State's evidence at all, because it was so unreasonable, improbable, and unsatisfactory that no rational trier of fact could have found that the elements of felony murder[1] had been proved beyond a reasonable doubt. Alternatively, he also raises numerous evidentiary issues, whether a witness should have been estopped from testifying, and whether the State failed to tender discovery pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). We agree that the State failed to prove defendant guilty beyond a reasonable doubt and will discuss both aspects of his reasonable-doubt argument.

¶ 77    In reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443

---

[1] Felony murder consists of a death that results from the commission of a criminal act that involves the use or threat of force or violence against any individual. *People v. Toney*, 337 Ill. App. 3d 122, 131 (2003).

U.S. 307, 318-19 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). To sustain a conviction, due process requires that the prosecution prove beyond a reasonable doubt every element of the offense. *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 27. The mandate that we consider all of the evidence does not require a point-by-point discussion of each piece of evidence as well as every possible inference to be drawn therefrom, as such a task would amount to a retrial on appeal. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). While it is for the jury to assess the credibility of the witnesses, and while the jury's finding is entitled to great weight, the jury's determination is not conclusive. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *Rivera*, 2011 IL App (2d) 091060, ¶ 25. Accordingly, where the evidence is so "unreasonable, improbable, or unsatisfactory" as to justify a reasonable doubt of the defendant's guilt, a conviction will be reversed. *Smith*, 185 Ill. 2d at 542.

¶ 78                    A. Intimidation as the Predicate for Felony Murder

¶ 79            1. Whether Intimidation Can Serve as the Predicate for Felony Murder[2]

¶ 80    A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly, by any means, a threat to inflict physical harm on the person threatened. 720 ILCS 5/12-6(a)(1) (West 2002). The State contends that intimidation can serve as the predicate forcible felony pursuant to the residuary clause of section 2-8 of the Criminal Code of 1961 (Code) (720 ILCS 5/2-8 (West 2002)). Section 2-8 provides that, in addition to those felonies enumerated, any other felony

---

[2] In order to sustain a charge of felony murder, the State is not required to prove an intentional murder, because the underlying felony substitutes for the intent to commit murder. *People v. Edwards*, 343 Ill. App. 3d 1168, 1179 (2003). Here, the fact of Carrick's death is not at issue, so the focus of this opinion is on the underlying felony of intimidation.

"which involves the use or threat of physical force or violence against any individual" qualifies as a forcible felony. 720 ILCS 5/2-8 (West 2002). The State argues that the intimidation statute uses terms very similar to those used in the residuary clause of section 2-8. That, according to the State, coupled with the purpose of the intimidation statute, brings intimidation within section 2-8. We have found no case in which intimidation has been used as the predicate forcible felony to prove felony murder. Nor do we need to decide the abstract question of whether intimidation could ever serve as the predicate for felony murder. We hold that, under the facts of the present case, the State failed to prove intimidation.

¶ 81                                    2. Intimidation as Charged in the Indictment

¶ 82    As we noted above, the State proceeded only on count I of the indictment. To recap: count I charged that defendant, "or one for whose conduct he is legally accountable," caused Carrick's death by striking "Carrick in the head" while "attempting or committing" the forcible felony of intimidation. Because the State charged that defendant directly committed the offense of intimidation or, in the alternative, was accountable for Lamb's conduct, we must examine (1) whether the State proved that defendant committed intimidation as a principal; and (2) whether the State proved that Lamb committed intimidation as a principal and that defendant was accountable for Lamb's conduct.

¶ 83        3. The State Failed to Prove that Defendant Committed Intimidation as a Principal

¶ 84    Intimidation is a specific-intent crime. *People v. Randle*, 38 Ill. App. 3d 720, 721 (1976). "Specific intent" designates a special mental element that is required above and beyond any mental state required with respect to the *actus reus* of the crime.[3] *People v. Robinson*, 379

---

[3] *Actus reus* is the wrongful deed that comprises the physical components of a crime and must generally be coupled with *mens rea* to establish criminal liability. Black's Law Dictionary

Ill. App. 3d 679, 684 (2008). Specific intent is made up of two elements: the defendant must have (1) intended to engage in certain acts that constitute the *actus reus*, and (2) the defendant must have performed those acts with an intended criminal result. *People v. Verkruysse*, 261 Ill. App. 3d 972, 975 (1994). Therefore, intimidation requires (1) that a threat be communicated (2) with the specific intent to coerce another to do something against his will. *People v. Peterson*, 306 Ill. App. 3d 1091, 1099-1100 (1999); *People v. Hubble*, 81 Ill. App. 3d 560, 563 (1980). The purpose of the intimidation statute is the prohibition of making threats intended to compel a person to act against his will. *Peterson*, 306 Ill. App. 3d at 1099. The intent to coerce the victim can be inferred from the defendant's statements and the surrounding circumstances. *Verkruysse*, 261 Ill. App. 3d at 975.

¶ 85    Intimidation requires proof of a threat of physical harm at some time, possibly in the future. *Randle*, 38 Ill. App. 3d at 721. The means or method used to communicate the threat is not an essential element of intimidation. *People v. Libbra*, 268 Ill. App. 3d 194, 199 (1994). Implicit in the word "threat," as used in the intimidation statute, is the requirement that it have a reasonable tendency to create apprehension in the victim. *People v. Holder*, 119 Ill. App. 3d 366, 372 (1983). Put another way, the victim must fear that the maker of the threat will carry it out. *Holder*, 119 Ill. App. 3d at 372.

¶ 86    *Holder* and *People v. Gallo*, 54 Ill. 2d 343 (1973), illustrate this axiom. In *Holder*, the defendant, a union representative of Redi-Mix cement truck drivers, approached the drivers' employer and stated that the trucks were sitting on the road and that " 'the drums aren't turning till [the employer] sign[s] the [union] contract.' " *Holder*, 119 Ill. App. 3d at 369. This court held that, in context, the statement had a reasonable tendency to create apprehension, because

39 (8th ed. 2004).

there was evidence that "all concerned were aware that if the drums did not turn then the cement would harden, resulting in damage to the trucks." *Holder*, 119 Ill. App. 3d at 372. In *Gallo*, the defendant was a loan shark who threatened to break the victim's legs in three or four places if he did not repay the loan with usurious interest and also threatened to send the " 'west side boys' " to collect the money. *Gallo*, 54 Ill. 2d at 353. Those threats caused the victim to become scared enough to report the incident to the State's Attorney. *Gallo*, 54 Ill. 2d at 353. Our supreme court held that, in context, the defendant's statements were an expression of the intent to act and had a reasonable tendency to coerce. *Gallo*, 54 Ill. 2d at 353.

¶ 87 The State posits that defendant used Lamb's mere presence as intimidation. In closing argument, the State proclaimed that "[defendant brought Lamb] into the store. That's the intimidation." The State further argued that the "threat" was not a "word" or "a gesture," but "a person." In its appellate brief, the State argues that "defendant intended to use [Lamb] as an instrument of intimidation" and that Lamb was defendant's "weapon," even though, at trial, Lamb testified to the exact opposite. Lamb testified that defendant did *not* ask him to threaten Carrick or to harm Carrick.

¶ 88 Given Lamb's denials, the State's theory that defendant used Lamb as his instrument of intimidation is built entirely upon unsupported inferences: (1) that, because defendant allegedly told Amen that Lamb was going to be his enforcer, *defendant and Lamb "must have" discussed and agreed that Lamb would be the enforcer*; (2) that, because defendant told Lamb that Carrick cashed his paycheck but did not repay defendant the money he owed for marijuana, *defendant's alleged request that Lamb talk to Carrick was a solicitation for Lamb to threaten harm to Carrick*; and (3) that, because Lamb was larger than Carrick and had a violent past, *Lamb's mere presence created fear in Carrick*.

¶ 89    An inference is a factual conclusion that can rationally be drawn by considering other facts. *People v. Funches*, 212 Ill. 2d 334, 340 (2004). Due process protects a defendant against conviction except upon proof beyond a reasonable doubt of "every fact necessary to constitute the crime with which the defendant is charged." *Funches*, 212 Ill. 2d at 342. An inference does not violate due process under three conditions: (1) there is a rational connection between the basic fact and the presumed fact; (2) the presumed fact more likely than not flows from the basic fact; and (3) the inference is supported by corroborating evidence of guilt. *Funches*, 212 Ill. 2d at 342-43.

¶ 90    Here, the inference that defendant and Lamb must have discussed and agreed that Lamb would act as defendant's enforcer is not rationally connected to and does not more likely than not flow from the basic fact that defendant allegedly told Amen that Lamb was his enforcer. Amen testified that he never saw Lamb acting as an enforcer. Indeed, Lamb refused to recover stereo equipment from Amen when defendant asked him to do that. Lamb testified that it was not his "job" to make Carrick pay defendant the money he owed. Lamb insisted that he confronted Carrick for his own motives and not on defendant's behalf.

¶ 91    The inference that defendant's call to Lamb was a solicitation for Lamb to threaten Carrick is not rationally connected to and does not more likely than not flow from the basic fact that defendant asked Lamb to "talk" to Carrick. Lamb denied that defendant solicited him to threaten Carrick. Lamb also denied that he intended to threaten or hurt Carrick. According to Lamb, during the argument in the produce cooler, he suddenly lost his temper and punched Carrick. Lamb testified that defendant had already confronted Carrick before Lamb arrived. Because, as Lamb testified, he and Carrick were friends, the inference that defendant asked Lamb to talk to Carrick to convince him to pay the money is just as likely, if not more so, as that

defendant used Lamb to threaten harm to Carrick. Moreover, defendant's telephone records conclusively demonstrated that he did not call or chirp Lamb.

¶ 92    Similarly, the inference that Lamb's mere presence instilled fear in Carrick because of their size difference and Lamb's violent past is not rationally connected to and does not more likely than not flow from the basic fact that Lamb argued with Carrick. The State introduced no evidence that Carrick knew about Lamb's past. There was no evidence that Carrick reacted in any way other than to continue arguing, which strongly suggests the opposite of fear. Lamb and Carrick were friends and Lamb testified that Carrick could come to him with problems.

¶ 93    Finally, none of the State's inferences was supported by corroborating evidence of guilt. Lippert's testimony that defendant told him that defendant arranged for the disposal of Carrick's body was so impeached as to be valueless. Lippert did not tell authorities his story until months after his alleged conversation with defendant, when he was in custody following his arrest for DUI. His testimony was contradicted by Denson, who testified that he was not with Lippert and defendant, as Lippert claimed, shortly before defendant allegedly confessed his complicity to Lippert. Lippert admitted that he had consumed 12 beers and 2 shots when defendant allegedly implicated himself. Then, when Lippert finally spoke to the police, he was drunk. Lippert told the FBI that his conversation with defendant seemed like a dream, adding that it was possible that he and defendant were tossing around theories about what happened to Carrick. Lippert told inconsistent stories: either that Lamb took Carrick's body to Iowa or that defendant's cousins did so.

¶ 94    "If there is no corroborating evidence, the leap from the basic fact to the presumed element must still be proved beyond a reasonable doubt." *Funches*, 212 Ill. 2d at 343. Here, the inferences the State draws are a leap too far. The State invested everything in Lamb by granting

him complete immunity, but Lamb failed to supply *any* evidence that defendant used him to threaten Carrick. Lamb's unequivocal testimony that defendant did *not* ask or tell him to threaten Carrick simply cannot be twisted to support the inference that defendant used Lamb to threaten Carrick. Accordingly, the State failed to prove that defendant committed intimidation as a principal.

¶ 95          4. The State Failed to Prove that Lamb Committed Intimidation as a Principal

¶ 96    To determine whether the evidence proved that Lamb committed intimidation as a principal and that defendant was accountable, we now focus on Lamb rather than defendant, because Lamb's conduct must satisfy all of the elements of intimidation. See *People v. Land*, 169 Ill. App. 3d 342, 355 (1988) (conviction of felony murder requires proof of all of the elements of the predicate forcible felony). Reviewing the State's evidence as it applied to Lamb, we are struck by the total absence of evidence that (1) Lamb communicated a threat of physical harm to Carrick (2) with the specific intent to coerce Carrick to pay defendant the money owed and (3) that Carrick feared that Lamb would carry out the threat.

¶ 97    The facts of this case are unlike those in *People v. Brown*, 44 Ill. App. 3d 104 (1976), where there was a threat and a connection between the threat and the victim's fear that the defendant would carry out the threat. In *Brown*, the victim purchased a pistol from the defendant. *Brown*, 44 Ill. App. 3d at 105. While the victim was walking to his car, the defendant accosted him and demanded the pistol's return. *Brown*, 44 Ill. App. 3d at 105. The defendant brandished a gun, struck the victim on the head, and stated, " 'I ought to kill you.' " *Brown*, 44 Ill. App. 3d at 105. In *Brown*, given the context of the demand, "I ought to kill you" had a reasonable tendency to coerce. Thus, as also illustrated in *Holder* and *Gallo*, there must be a nexus between a demand and a resulting fear.

¶ 98    Here, viewing the evidence in the light most favorable to the State, *at best* the State's evidence showed only that defendant and Carrick were arguing and that Lamb jumped into the argument. According to Lamb, Carrick continued arguing with him. There was no evidence that Carrick was cowed by Lamb or that he became apprehensive *as a result of any demand that Lamb made.* There was no evidence of a "fear-instilling communication of a specified consequence of noncompliance" with a demand. See *State v. Robertson*, 649 P.2d 569, 578 (Or. 1982) (analyzing an intimidation statute similar to ours for unconstitutional overbreadth). Significantly, Lamb did not testify to any words that were used. Nor could Lamb's mere presence constitute intimidation, because there was no evidence that Carrick knew of Lamb's past or was otherwise afraid of Lamb.

¶ 99    Lamb testified that the argument was over the money that Carrick owed defendant, so a reasonable inference is that there was a dispute. However, engaging in an argument or a dispute is not necessarily intimidation, even though the participants are not physically matched. Otherwise, everyone who engages in an argument could be convicted of felony intimidation. Neither is a battery intimidation. *People v. Lucien*, 128 Ill. App. 3d 706, 709 (1984) (battery, assault, and intimidation statutes safeguard individuals from disparate harms). Battery and aggravated battery are general-intent crimes. *Robinson*, 379 Ill. App. 3d at 684. If all that were necessary to prove the specific-intent crime of intimidation were the general intent to commit a battery, the legislature's requirement of specific intent would be written out of the statute. Consequently, even if Lamb "muffed" Carrick into the cooler, he might have committed a battery, but he did not commit intimidation. Because the State failed to prove that Lamb committed intimidation as a principal, defendant could not be accountable for Lamb's commission of that offense. See *People v. Taylor*, 186 Ill. 2d 439, 445 (1999) (in order to hold a

defendant accountable, there must be evidence that the defendant aided or abetted the principal prior to or during the commission of a criminal offense). Accordingly, the State failed to prove the predicate forcible felony of intimidation.

¶ 100        B. The Physical Evidence and Disinterested Witnesses Contradicted Lamb

¶ 101   Even if we were to hold that the State introduced evidence on every element of the predicate forcible felony of intimidation to prove felony murder, we would still be constrained to reverse defendant's conviction, as the State's evidence was so unreasonable, improbable, and unsatisfactory that a reasonable doubt exists. The physical evidence and the testimony of disinterested witnesses show that whatever happened to Carrick could not have been what Lamb portrayed. In *People v. Schott*, 145 Ill. 2d 188, 206 (1991), our supreme court instructed that, while a court of review will not normally substitute its own judgment in regard to resolving conflicts and inconsistencies in testimony, it can and will set aside a verdict when the evidence raises a reasonable doubt of the defendant's guilt.

¶ 102   The physical evidence is irreconcilable with Lamb's testimony that nothing occurred in the hallway outside the cooler. Blood spatter was on the north wall of the hallway outside the produce cooler. DNA analysis proved that the blood spatter was from Carrick. At trial, the State attempted to account for the blood spatter by arguing that the blood came from Carrick's body as it was being carried down the hallway to the southeast exit door. That theory was not supported by any evidence. Phillips' opinion was that the blood spatter was cast off blood, as though from a swinging object, or from a person moving as he or she bled. Phillips was clear that the blood spatter was not from a drip and was not caused by an impact. Because the blood spatter was so low on the wall, Phillips did not have an opinion as to what had happened.

¶ 103   The blood at the scene is also irreconcilable with Lamb's testimony that only he, defendant, and Carrick were involved.  Two persons' blood was found at the scene: Render's and Carrick's.  Render's blood was also found on one of his own shoes.  In closing argument, the State accounted for Render's blood with the outlandish theory that he bit his fingernails.

¶ 104   Render cannot so easily be dismissed.  Kepple testified that Render was missing between 5 p.m. and 7 p.m., and when Kepple next saw him he was by the mop room.  Smith testified that Carrick entered the break room at 6:45 p.m. and asked where Render was.  Two days after Carrick's disappearance, Render quit his job at Val's Foods.  Six days later his father reported that he ran away from home.

¶ 105   Lamb's testimony was contradicted by still other evidence.  Lamb testified that he returned to the store at about 6:45 p.m. in response to defendant's phone call.  Various witnesses described the type of Nextel phone defendant used, and the telephone records disclosed that defendant did not call or chirp Lamb.  Lamb's testimony that he returned to the store at 6:45 p.m. was also contradicted by other witnesses.  Eddy saw him at about 5 p.m., and Kepple saw him between 4:30 p.m. and 5 p.m., but no one stated that he was in the store after that.  Kepple testified that Lamb was not in the cooler area at 7 p.m. or at 7:20 p.m.  DePierro testified that he saw Lamb, Carrick, and defendant in a discussion sometime between 5 p.m. and 7 p.m., but he did not tell Carpanzano that Lamb was there.  Further, DePierro's testimony is suspect because of his impairments.  At trial, he could not remember what Lamb looked like.

¶ 106   Kepple testified that he walked through the produce cooler at 7 p.m.  He saw an unusual pool of water on the floor and signs that someone had mopped the hallway outside the cooler door.  He also discovered in the cooler a Mountain Dew bottle cap that turned out to have Carrick's DNA on it.  Since Smith saw Carrick in the break room asking about Render at about

6:45 p.m., whatever happened in the hallway and the cooler must have occurred shortly after 6:45 p.m. and before 7 p.m.

¶ 107   Lamb testified that, when he returned to the store at about 6:45 p.m., he found defendant arguing with Carrick in the produce room.  However, Smith, Eddy, Stittgen, and Kepple placed defendant in the break room, on the opposite side of the store, at 6:45 p.m.  Eddy testified that he and defendant were eating a pizza from 6:45 p.m. to 7 p.m., when Eddy went to the front of the store to collect carts.  Even though Eddy testified that he and Carrick were not close, there is no evidence to suggest that Eddy would provide his brother's accused killer with a false alibi.

¶ 108   While it is the fact finder's province to judge how flaws in testimony affect a witness's credibility as a whole, the fact finder's judgment must be reasonable in light of the record. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).  A reviewing court, after considering the entire record, can find that flaws in testimony made it impossible for any trier of fact reasonably to accept any part of it.  *Cunningham*, 212 Ill. 2d at 283.  Such is the case with Lamb.  His testimony was so lacking in credibility that a reasonable doubt of defendant's guilt remains.  See *Schott*, 145 Ill. 2d at 206-07 (State's key witness's testimony was so fraught with inconsistencies and contradictions that her testimony was incredible).

¶ 109   Lamb committed attempted murder at age 14.  After incarceration as a juvenile, he served five different penitentiary sentences.  He was charged with seven drug felonies and was looking at spending at least 12 more years in prison.  Then he received immunity for murder.  The State reduced his sentence to six years, of which he served three.  Then he expected more favors for his testimony: transfer to better prisons; additional good time; work release; reduction of his sentence to five years; expungement of his attempted-murder adjudication; release from house arrest for a fight in the penitentiary; and vacatur of a parole violation.  Lamb wrote the

prosecutor: "I've done everything that you've asked me to do, now I need you to come through"; "you told me I would be taken care of"; "please pull some strings"; "I thought we had an understanding"; and "I have to tell [prison authorities] so many lies about everything that I'm starting to get confused." It does not matter that the prosecution did not respond to Lamb's later entreaties. The point is that Lamb was willing to tailor his testimony for favors received. A witness who is promised leniency has limited credibility. *People v. Williams*, 65 Ill. 2d 258, 267 (1976). It is "universally recognized" that the testimony of a "confessed criminal" is "fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution." *People v. Hermens*, 5 Ill. 2d 277, 285 (1955). Leniency was not Lamb's only motive. He testified that he was aware that defendant had implicated him as someone who might have been capable of harming Carrick.

¶ 110 Moreover, Lamb admitted that he lied whenever it suited him. He testified that he lied to the grand jury but was never charged with perjury. He testified that he lied to FBI agents. He said that he told prison authorities so many lies that he got confused.

¶ 111 Each time Lamb told the story of how he got Carrick into the cooler, he changed and embellished it to make his role appear more threatening. Immediately after receiving immunity, Lamb said that he and Carrick "walked" into the cooler. In a second statement to authorities, he said that he "tossed" Carrick into the cooler. At trial, he improved his story again and said that he "muffed" Carrick into the cooler.

¶ 112 In *Schott*, our supreme court found a reasonable doubt where the complainant was a person who lied " 'a lot' " and whose testimony was so riddled by inconsistencies and contradictions that she lacked credibility. *Schott*, 145 Ill. 2d at 206-07. Lamb's entire testimony

was so inconsistent, contradictory, and incredible that it was "palpably contrary to the verdict." *Williams*, 65 Ill. 2d at 268.

¶ 113   Aside from Lamb, the only witness who implicated defendant was Lippert.  However, his testimony was incredible, as we discussed above.  Lippert told authorities about defendant's alleged admission months later and only then because he was in custody.  Lippert admitted that he was drunk when defendant allegedly told him how Carrick's body was disposed of and that he was drunk when he related the alleged conversation to the police.  Lippert then told the FBI that possibly he either dreamed the incident or he and defendant were only batting around theories about what happened to Carrick.

¶ 114   Amen's testimony was no better.   When, according to Amen, a convicted felon, defendant said, "I make people disappear," they were in a bar trading insults and barbs with each other.  Amen was also impeached with testimony that he had previously said only that he had *overheard* defendant make the statement in a bar.

¶ 115   As our supreme court said in *Smith*, "When the State cannot meet its burden of proof, the defendant must go free."  *Smith*, 185 Ill. 2d at 545-46.  While we acknowledge that the jury apparently believed Lamb despite the fact that his weaknesses were well exposed on cross-examination, "[a] fact finder's acceptance of certain testimony does not guarantee its reasonableness."  *Rivera*, 2011 IL App (2d) 091060, ¶ 39.  We also acknowledge that a defendant's conviction can be upheld even when the State's witnesses are questionable. However, when a witness's testimony is so fraught with inconsistencies and contradictions that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt, we will reverse. *Schott*, 145 Ill. 2d at 206.  We have minutely examined the evidence in the present case and are constrained to hold that no rational trier of fact could have found that the State proved

the predicate forcible felony of intimidation beyond a reasonable doubt. At trial, the State emphasized the fact that Carrick's body has never been recovered. That is as tragic as the fact that the truth has not yet come to light. The evidence against defendant was so lacking and so improbable that "it is simply unreasonable to sustain the finding of guilt beyond a reasonable doubt." *Rivera*, 2011 IL App (2d) 091060, ¶ 39. Our job is to examine the legal issues and the evidence that was presented at trial and to uphold the reasonable-doubt standard. *Rivera*, 2011 IL App (2d) 091060, ¶ 47. Otherwise, "[n]o citizen would be safe from prosecution." *Smith*, 185 Ill. 2d at 546.

¶ 116　Because the State's evidence was insufficient to prove defendant guilty beyond a reasonable doubt, we reverse defendant's conviction of first-degree murder.

¶ 117　Reversed.